EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ANTONIO PACHECO PADRÓ y MANUEL DE CATALÁN, acusados y apelantes.

Núm. 8384.—*Sometido:* Mayo 1, 1941. *Resuelto:* Mayo 27, 1941.

.F. M. Susoni, Jr., abogado de los apelantes; Hon. Procurador General George A. Malcolm, R. A. Gómez, Fiscal del Tribunal Supremo y Luis Negrón Fernández, Fiscal Auxiliar, abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

Por convenio de las partes estas dos causas se vieron conjuntamente en la Corte de Distrito de San Juan y en apelación se han tramitado en un solo recurso. Se originaron separadamente ante la Corte Municipal de San Juan, a virtud de dos denuncias, una contra Antonio Pacheco Padró por infracción al artículo 243 del Código Penal, que lee así:

"En la Corte Municipal del Distrito Judicial Municipal de San Juan, Puerto Rico, Sección Primera.—El Pueblo de Puerto Rico *v.* Antonio Pacheco Padró.—Criminal Núm. 10919. Sobre: Libelo.— Denuncia. Yo, Rafael Martínez Nadal, vecino de Guaynabo, Puerto Rico, y Presidente del Senado de esta Isla, formulo denuncia contra Antonio Pacheco Padró por el delito de Libelo (infracción al artículo 243 del Código Penal), cometido de la manera siguiente: que allá por uno de los días del mes de agosto de 1938 y en la ciudad de San Juan de Puerto Rico, que forma parte del distrito judicial municipal del mismo nombre, el acusado suscribió e hizo publicar en el periódico denominado *'Florete'* que se edita los sábados en San Juan, Puerto Rico, un artículo que circuló en dicho periódico públicamente en esta ciudad, y entre otros ejemplares, en el marcado con el Núm. 402 (edición de 20 de agosto de 1938 de dicho semanario) siendo dicho artículo el siguiente: 'Martínez Nadal defiende tercamente el monopolio de la energía eléctrica. A medida que pasa el tiempo vamos conociendo menos a los muchos enemigos portorriqueños que tiene Puerto Rico. Nos vamos convenciendo de la apremiante necesidad que hay en nuestro país de hacer una verdadera labor de saneamiento político, para adecentarnos cívicamente en forma que se permita a Puerto Rico tener frente a sus asuntos a hombres íntegros y leales, y no a mercaderes inescrupulosos. La maldad del coloniaje está precisamente en que facilita y ampara el mangoneo y la corrupción en gran escala. La colonia termina por chuparse a los mejores hombres, por tragárselos y por hacer de ellos pobres guiñapos. Veamos, por ejemplo, la situación en que se ha colocado el señor Rafael Martínez Nadal, Presidente del Senado y de la Unión Republicana. Martínez Nadal ha tenido por mucho tiempo la confianza del pueblo, que lo ha apreciado sin diferencias partidistas. Tenía el aprecio y estimación general. Sus gestos, por lo menos, hacían que se le tuviera cierta estimación. Pero, de un tiempo a la fecha, Martínez Nadal ha entrado descaradamente en la obscura zona de los políticos faltos de principios. Ni cree en ellos ni vive para ellos. ¿Cómo puede explicarse que Martínez Nadal se convierta ahora en el paladín de la Porto Rico Railway, Light and Power Company? ¿Qué maravilloso hilo eléctrico ha conectado a la persona del señor Martínez Nadal? Cuando está en el Senado Martínez Nadal es abogado. Y cuando está en las cortes Martínez Nadal es el Presidente del Senado. ¡Bonita manera tiene don Rafa de servir al país, burlando la confianza que en él depositaron las organizaciones portorriqueñas! Martínez Na-

dal se coloca frente al Nuevo Trato para defender los intereses del pulpo eléctrico, que explota a miles de familias portorriqueñas con sus elevadas tarifas. Martínez Nadal sabe que en nuestro país es vital para la economía, para la agricultura, para el comercio y para las industrias, el abaratamiento de la energía eléctrica. ¡Y no obstante saber eso, Martínez Nadal se pone a defender a las compañías privadas desde su sitial de Presidente del Senado! ¿Hasta dónde va a llegar el señor Martínez Nadal con esa política de entregamiento indigno a los intereses del monopolio eléctrico? ¿Cree el señor Martínez Nadal que el país no se entera de lo que pasa por debajo, por encima, o por detrás de los escritorios del Senado? ¿Por qué traiciona Martínez Nadal a Puerto Rico, poniéndose al servicio del monstruo de la electricidad? ¿Por qué resiste Martínez Nadal a la demanda pública de Puerto Rico de que se ponga en manos del pueblo la energía eléctrica? ¿Qué beneficio tiene Martínez Nadal en esa corriente de oro boricua que sale todos los años con destino al Canadá? Más honradez, más decencia política, más lealtad a Puerto Rico es lo que nuestro pueblo le pide al señor Martínez Nadal y al grupo que en las Cámaras obstaculiza la legislación que tiene por finalidad libertar a Puerto Rico del monopolio eléctrico que le agarrota. ¿Quiere entenderlo, por fin, el señor Martínez Nadal?' El acusado, quien desempeña el cargo de Sub Director del dicho período denominado 'Florete', es el único autor del artículo transcrito en la presente denuncia y gestionó su publicación con la maliciosa intención de difamar al Presidente del Senado de Puerto Rico, el denunciante en este caso, y para impugnar su honradez e integridad como tal Presidente del Senado de Puerto Rico, exponiéndolo al odio y ridículo público, a sabiendas de que las imputaciones que hace son falsas y maliciosas. Hecho contrario a la Ley.''

Y la otra contra Manuel de Catalán, por infracción al artículo 253 del Código Penal, que alega lo siguiente:

''En la Corte Municipal del Distrito Judicial Municipal de San Juan, Puerto Rico. Sección Primera. El Pueblo de Puerto Rico v. Manuel de Catalán. Criminal Núm. 10939. Sobre: Infracción al artículo Núm. 253 del Código Penal. Denuncia. Yo, Rafael Martínez Nadal, vecino de Guaynabo, Puerto Rico, y Presidente del Senado de esta Isla, formulo denuncia contra Manuel de Catalán por el delito de infracción artículo núm. 253 del Código Penal (publicación de retratos y caricaturas), cometido de la manera siguiente:

que allá por uno de los días del mes de agosto de 1938 y en la ciudad de San Juan de Puerto Rico, que forma parte del distrito judicial municipal del mismo nombre, el acusado Manuel de Catalán confeccionó e hizo publicar en el periódico denominado '*Florete*', que se edita los sábados en San Juan, Puerto Rico, una caricatura del denunciante que circuló en dicho periódico públicamente y en la ciudad de San Juan, y entre otros ejemplares en el marcado con el núm. 402, edición de 20 de agosto de 1938 de dicho semanario, describiéndose en dicha caricatura del modo siguiente: Bajo el título 'EN EL SENADO', aparece el denunciante en su carácter de Presidente del Senado, sentado en una silla presidencial, con mallete en la mano, y conectados a dicha silla presidencial del Senado de Puerto Rico aparecen dos aparatos o *switches* eléctricos unidos a las patas traseras de dicha silla, uno expresando que es la Mayagüez Light y otro expresando que es la Porto Rico Railway, Light, cuyas dos compañías le dan corriente a dicha silla y por ende, al Presidente del Senado, consignándose al final de dicha caricatura las siguientes frases: 'LAS DOS PODEROSAS RAZONES QUE MOTIVAN EL SABOTAJE.' Que el acusado Manuel de Catalán, quien trabaja para dicho semanario como caricaturista, es el único autor de la misma y confeccionó la repetida caricatura con la maliciosa intención de ofender al denunciante en su probidad, entereza, virtud, fama o móviles políticos, tendiendo a exponerlo al odio, ridículo o desprecio público, a sabiendas de que tal caricatura representa o imputa acciones falsas y malicosas. Hecho contrario a·la ley.''

Ambos acusados fueron convictos en la corte municipal y vistas las causas *de novo* en apelación los acusados fueron también declarados culpables y condenados a sufrir una pena de seis meses de cárcel cada uno, de cuyas sentencias apelan para ante este tribunal y señalan la comisión de tres errores por la corte inferior al resolver que el fiscal no venía obligado a probar la malicia de los acusados, por constituir este caso la excepción a la regla, al considerar que los acusados en su carácter de periodistas cometieron libelo al publicar y hacer circular el artículo y la caricatura y al considerar y resolver que los acusados no probaron la veracidad de todos y cada uno de los particulares de la supuesta pieza libelosa.

▆▆▆▆ Considerando el primero, veamos lo que disponen los artículos del Código Penal que se dicen infringidos. El artículo 243, en el caso de Antonio Pacheco Padró, dispone lo siguiente:

"Constituye libelo cualquiera maliciosa difamación expresada por medio de escritos, impresos, signos, láminas, dibujos, u otra forma análoga, tendentes a denigrar la memoria de un difunto, o impugnar la honradez, integridad, virtud o buena fama de un vivo, o publicar sus defectos naturales o supuestos, exponiéndole así al odio, desprecio o ridículo público."

Y en cuanto al caso de Catalán, el artículo 253 dice así:

". . . Será asimismo ilícito publicar en cualquier periódico, cartel, hoja suelta, libro, publicación por entregas, o suplemento a los mismos, cualquiera *caricatura* de persona residente en Puerto Rico, la cual ofendiere de algún modo en su honor, probidad, entereza, virtud, fama o móviles comerciales o políticos a la persona caricaturada, o tendiere a exponerle al odio, ridículo o desprecio público." (Itálicas nuestras.)

Para sostener el primer señalamiento los apelantes se basan en lo que dispone el artículo 249 del mismo cuerpo legal, que prescribe:

"Ningún noticiero, director o propietario de periódico podrá ser procesado por la imparcial y exacta relación de actos judiciales, legislativos, o de cualquier otro carácter oficial, o de cualquier manifestación, discurso, argumento o debate que en ellos tuviere lugar, a no probarse que hubo maliciosa intención al relatarlos, lo cual no deberá presumirse del mero hecho de la publicación."

Lo primero que resalta de una mera lectura de este último artículo es que establece un privilegio, reconocedor de la libertad de la prensa garantizada por nuestra Carta Orgánica, a favor de los periodistas que publiquen una "imparcial y exacta relación ('report' dice el texto inglés) de actos judiciales, *legislativos* o de cualquier otro carácter oficial o de cualquier manifestación, discurso, argumento o debate que en ellos tuviere lugar" y cuando ese relato es así exacto e imparcial deberá exigirse prueba de la maliciosa intención al

relatarlos antes de que pueda considerarse cometido delito alguno. [2] La interpretación del privilegio debe ser estricta, pues las disposiciones del artículo 249 están limitadas por las del artículo 250 del Código Penal que dispone que:

"Las observaciones o comentarios infamatorios relacionados con el privilegio concedido en el artículo anterior no gozarán de inmunidad por razón de estar así relacionados."

De manera que una relación o reseña exacta, justa e imparcial de las actuaciones legislativas del denunciante Sr. Martínez Nadal, como la de cualquier otro legislador, nunca podría considerarse libelosa *per se* y al no presumirse maliciosa la publicación correspondería al fiscal probar la existencia de la maliciosa intención. Pero cuando el relato o reseña deja de ser exacto e imparcial y además no es tal relato o reseña sino un artículo que comenta la actitud, que según el autor ha asumido el denunciante en relación con determinada legislación pendiente de aprobación o ya aprobada y usa un lenguaje infamatorio e injurioso, cesa el privilegio y la publicación tiene la presunción de ser maliciosa según el artículo 245 del Código Penal, que dispone:

"Se presumirá maliciosa toda publicación injuriosa, si no se probare que hubo motivo justificable para hacerla."

El artículo 249 de nuestro Código, equivalente al 254 del Código Penal de California, tiene su origen histórico en el derecho común de Inglaterra. En 1799, se resolvió por la Corte de King's Bench, en el caso de *Rex* v. *Wright*, 8 T. R. 293, 101 Eng. Reprint 1396, que la publicación de una reseña de los procedimientos habidos en la Cámara de los Comunes no constituía libelo, aunque echara sombras sobre un individuo. Dijo el Juez Lawrence en ese célebre caso:

"Si bien la publicación de dichos procedimientos puede perjudicar a la persona en cuestión, sin embargo, es de inmensa importancia para el público que los procedimientos de las cortes de justicia sean universalmente conocidos. Las mismas razones son aplicables también a los procedimientos del Parlamento; es de

beneficio para el público, y hasta para los mismos cuerpos legislativos, *que reseñas exactas de sus procedimientos sean propagadas;* y dichas entidades serán privadas de ese beneficio si ninguna persona pudiera publicar una reseña de sus procedimientos sin ser castigado por libelo.'' (Itálicas nuestras.)

Véase la anotación en 19 A. L. R. 1470, 1499, sobre ''Libel and Slander.''

En California se ha resuelto que un artículo, que después de hacer una reseña de un proceso por perjurio, comentaba que el acusado era más bien víctima que victimario, y que había sido el instrumento de otros, no tiene la protección del privilegio concedido por el estatuto a un *''fair and true report of judicial proceedings.''* *Lyon* v. *Fairweather et al.*, 218 P. 477. Dijo la corte en su opinión, a la página 479:

''La publicación que el estatuto declara privilegiada es una relación imparcial y exacta de los hechos; *el estatuto no incluye como privilegiados hechos fuera del récord o comentarios por el autor.* Si del artículo en cuestión se hubieran omitido los últimos cuatro párrafos, el artículo hubiera caído dentro del privilegio tal como fué definido por el estatuto, pero uno no tiene nada más que leer los últimos cuatro párrafos para notar en seguida que dichos párrafos *contienen comentarios y no los hechos que se desarrollaron en la vista judicial que el artículo pretende reseñar.''* (Itálicas nuestras.)

En el caso de *Pfister* v. *Sentinel Co.*, 108 Wis. 572, 84 N. W. 887, la Corte Suprema de Wisconsin declaró que:

''Un artículo en el que se decía que los demandantes y otro, por medio de su riqueza y poder político, habían obtenido un dominio absoluto sobre el alcalde y la mayoría del consejo municipal con relación a la obtención de una franquicia para un tranvía, y que el demandante, a pesar de dicha compra, no había perdido su prestigio en la comunidad y, por el contrario, continuaba siendo un miembro prominente de ella, no era privilegiado por no ser una relación de un acto oficial, ya que la parte esencial del artículo consistía de las *conclusiones y deducciones del autor.''* (Itálicas nuestras.)

En 36 Corpus Juris, pág. 1273, párrafo 264, se reconoce esta limitación al privilegio de que ningún director o reportero podrá ser procesado por la relación de actos judiciales o legislativos, al decirse:

"El artículo debe contener solamente aquello que ocurrió en el curso de los procedimientos, *y cualquier materia añadida a eso por el editor, difamatoria del demandante, no es privilegiada, aunque se haya publicado de buena fe o creyéndose razonablemente que era cierta.*" (Itálicas nuestras.)

La cuestión no es nueva en esta jurisdicción y fué resuelta en contra de la teoría de los apelantes en el caso de *Pueblo* v. *Sierra* (a) *Luis Dalta*, 43 D.P.R. 261, donde se dijo lo siguiente:

"Como muy bien indica el apelante en su alegato la publicación comprende dos partes, una que manifiesta ser la relación de lo ocurrido en la vista de un recurso ante esta Corte Suprema y otra que contiene los comentarios del publicista.

"Con respecto a esos comentarios el propio Código Penal, en su artículo 250, dispone: 'Las observaciones o comentarios infamatorios relacionados con el privilegio concedido en el artículo anterior no gozarán de inmunidad por razón de estar así relacionados.'

"Examinada la evidencia aportada por el acusado, encuéntrase que en verdad muchas de las cuestiones que se dice en la publicación que planteó el abogado Coll y Cuchí tienen apoyo en lo que el mismo abogado declaró que dijo y en las declaraciones de los testigos Caso y Rossy. Algunas no. Si de sólo esa parte de la publicación se tratara, nos inclinaríamos a la revocación de las sentencias recurridas, basándonos en una interpretación liberal de lo dispuesto en el artículo 249 del Código Penal.

"Pero hay más, el publicista va más lejos y en el título y el comienzo del artículo y en los párrafos finales del mismo hace afirmaciones imputando a los Sres. Guerra, Rodríguez Serra y del Valle la comisión de actos que de ser ciertos demostrarían su falta de integridad y virtud. ¿Y qué base tiene para hacer afirmaciones semejantes? Sólo el informe oral del abogado de una de las partes en un recurso controvertido que se somete para ser resuelto a un tribunal de justicia. Tal base, sin más no es suficiente. *Lanzar a la publicidad como ciertas acusaciones tan graves con ese solo fun-*

*damento, no está justificado. La presunción de malicia subsiste y el delito debe entenderse cometido. La libertad de la palabra hablada o escrita no sufre llegándose a esa conclusión. Sólo se exige la responsabilidad que toda acción humana lleva consigo."* (Itálicas nuestras.)

Leído y examinado detenidamente el artículo publicado por el acusado Antonio Pacheco Padró no puede sostenerse que le cubre privilegio alguno. No es un relato o reseña de ningún acto legislativo, sino un artículo dedicado a comentar, desde el punto de vista del autor, la actitud del Sr. Martínez Nadal en relación con determinada legislación hidroeléctrica. Basta citar algunos conceptos usados para que resalte aún más que al leerse en conjunto, la gravedad de las imputaciones que contiene. Veamos:

"Pero, de un tiempo a la fecha, Martínez Nadal ha entrado descaradamente en la obscura zona de los políticos faltos de principios. Ni cree en ellos ni vive para ellos. ¿Cómo puede explicarse que Martínez Nadal se convierta ahora en el paladín de la Porto Rico Railway, Light & Power Company? *¿Qué maravilloso hilo eléctrico ha conectado a la persona del Sr. Martínez Nadal?* . . . ¿Hasta dónde va a llegar el Sr. Martínez Nadal con esa política de *entregamiento indigno a los intereses del monopolio eléctrico?* ¿Cree el Sr. Martínez Nadal que el país no se entera *de lo que pasa por debajo, por encima, o por detrás de los escritorios del Senado?* . . . *¿Qué beneficio tiene Martínez Nadal en esa corriente de oro boricua que sale todos los años con destino al Canadá? Más honradez, más decencia política, más lealtad a Puerto Rico es lo que nuestro pueblo le pide al Sr. Martínez Nadal* . . . ¿Quiere entenderlo, por fin el Sr. Martínez Nadal?" (Itálicas nuestras.)

· El hecho de que se use la forma interrogativa y no la afirmativa no favorece en nada al acusado ni hace variar lo infamatorio de los conceptos usados. Al hacer las dos preguntas últimas e inmediatamente decir "más honradez, más decencia política, más lealtad a Puerto Rico es lo que nuestro pueblo le pide al Sr. Martínez Nadal" claramente se está imputando por el autor al Sr. Martínez Nadal falta de honradez por estar recibiendo beneficios en la corriente de

oro boricua que sale todos los años con destino al Canadá. La acusación es grave y maliciosa *per se*. No puede, en verdad, sostenerse que le proteja privilegio alguno.

En cuanto a la caricatura que apareció en el mismo número de *Florete* que el artículo, después de leer éste y especialmente la pregunta: ''¿Qué maravilloso hilo eléctrico ha conectado a la persona de Martínez Nadal?'' y ver en la caricatura la figura del denunciante sentado en una silla presidencial, con mallete en mano, y conectados a dicha silla dos aparatos o *switches* eléctricos por medio de alambres unidos a las patas traseras, uno diciendo Porto Rico Railway, Light & Power Co. y el otro Mayagüez Light, sólo puede llegarse a la conclusión de que la caricatura es una demostración gráfica de parte de lo que dice el artículo y más aún cuando al pie de la caricatura se dice: ''Las dos poderosas razones que motivan el sabotaje.''

En cuanto a caricaturas, el artículo 253, supra, no establece privilegio alguno y no es aplicable, por tanto, el artículo 249, antes citado. En el artículo 253 no hay nada que exija que una caricatura se haya publicado maliciosamente. Sólo se declara *ilícita* su publicación si ésta ''ofendiere de algún modo en su *honor, probidad, virtud, fama* o *móviles* comerciales o *políticos* a la persona caricaturada, o tendiere a exponerle al odio, ridículo o desprecio público.'' Debe desestimarse el primer error imputado.

El segundo y el tercero los discuten los apelantes conjuntamente. Se refieren a la prueba, la que hemos examinado detenidamente según aparece en la transcripción de evidencia y estamos enteramente convencidos que la presentada para sostener las denuncias, al ser creída por la corte inferior, era suficiente para declarar culpables a los acusados. No se alega que el juez actuara movido por pasión, prejuicio o parcialidad y no habiendo cometido manifiesto error al apreciar la prueba, no procede la revocación por el segundo señalamiento. En cuanto a que la corte erró al considerar y resolver que los acusados no probaron la veracidad de todos

y cada uno de los particulares de la supuesta pieza libelosa, lo que tiende a probar la extensa prueba de los acusados es que con anterioridad a la publicación del artículo y de la caricatura objeto de estas acciones, la revista *Florete* realizó una intensa campaña a favor de la insularización de todas las fuentes hidroeléctricas del país y se opuso a que la Legislatura de Puerto Rico aprobara determinado proyecto de ley que tendía, según dicho periódico, a favorecer a la Porto Rico Railway, Light & Power Co. y a perjudicar a la autoridad de Fuentes Fluviales de Puerto Rico. Esta campaña cubre las ediciones de *Florete* de 2 de abril de 1938 a 13 de agosto del mismo año. En forma alguna ninguno de los artículos publicados y tampoco la prueba testifical tiende siquiera remotamente a demostrar la veracidad de las imputaciones contenidas en el artículo publicado por el acusado Antonio Pacheco Padró en el número de fecha 20 de agosto de 1938, ni motivos justificados para hacerlas.

■ No está envuelta en estos casos, según insisten los apelantes, limitación alguna al derecho constitucional de libertad de la prensa. La campaña que la revista *Florete* llevó a cabo durante varios meses demuestra que mientras hizo buen uso de ese derecho nadie fué denunciado. Lo que garantiza la Constitución de los Estados Unidos y la Carta Orgánica de Puerto Rico es el buen uso pero no el abuso de ese derecho. Los derechos constitucionales de los individuos particulares son tan sagrados como la libertad de la prensa y el hecho de que el denunciante en este caso fuera un legislador no le privaba de su derecho a no ser difamado maliciosamente. Los periodistas gozan de un privilegio que les reconoce nuestro Código Penal en su artículo 249, pero si lo violan no pueden ir más allá y tratar de ampararse bajo el privilegio más amplio y protector de la libertad de la prensa. Ésta puede y debe ser libre sin necesidad de caer en la malicia, el escándalo o la difamación, y la garantía constitucional antes mencionada no constituye defensa alguna cuando se comete el delito de libelo.

Desde el año 1904 este tribunal, en el caso de *Ex parte Bird*, 5 D.P.R. 247 (2ª. ed.), al referirse a la libertad de la palabra y de la prensa garantizada por la primera enmienda a la Constitución de los Estados Unidos, se expresó, por medio del Juez Asociado Sr. MacLeary, en esta forma:

"Nosotros creemos, sin duda alguna, que nadie, bajo estas disposiciones de la Constitución, aún si se sostuviera que está vigente en esta Isla, podría reclamar que por las mismas tendría derecho de publicar, *a su capricho, cuanto le plugiera en cuanto a personas o funcionarios, o jueces de los tribunales, en sus relaciones públicas o particulares. En otras palabras, es la libertad de la prensa y no la licencia desenfrenada lo que se intenta proteger por esta disposición de la Constitución.*" (Itálicas nuestras.)

No otra puede ser la doctrina que debe prevalecer.

*No habiéndose cometido los errores señalados, procede la confirmación de las sentencias en estos casos.*

### EN MOCION DE RECONSIDERACION

#### Julio 9, 1941

Los acusados apelantes solicitan reconsideremos nuestra sentencia de mayo 27 de 1941 por la que confirmamos la dictada por la corte inferior. En su extensa moción de reconsideración se limitan los apelantes a promover de nuevo la cuestión del alcance que debe dársele al privilegio contenido en el artículo 249 del Código Penal e insisten en que de prevalecer la interpretación que a dicho artículo le damos en nuestra opinión anterior sería limitar el privilegio de la libertad de la prensa consignado en nuestra Carta Orgánica. Citan varios párrafos del conocido libro *"Hold Your Tongue"* de Morris L. Ernst y Alexander Lindey.

Aunque ya tratamos esta cuestión de la libertad de la prensa en nuestra anterior opinión, parece conveniente que ampliemos lo que allí dijimos con algunas citas adicionales, que no sean de nuestra propia jurisprudencia, para que se vea claramente que lo resuelto por este tribunal se ajusta

estrictamente a lo resuelto por los más altos tribunales de los distintos Estados, así como por el Tribunal Supremo de los Estados Unidos.

En 11 American Jurisprudence 1113, sección 321, se expone en parte la doctrina sobre las limitaciones de la libertad de palabra y de la prensa, en esta forma:

"El derecho o privilegio a la libertad de palabra y de prensa, garantizado en las constituciones de los Estados Unidos y de los varios Estados, tiene sus limitaciones. No es un derecho absoluto pues aunque las limitaciones se reconocen sólo en casos excepcionales, la prohibición a que se legisle en contra de la libertad de palabra no tiene la intención de dar inmunidad para cualquier uso o abuso de lo dicho.

"Las limitaciones a dicho derecho pueden surgir por implicación pero frecuentemente existen por legislación expresa en la misma Carta Orgánica ya que muchas de las constituciones de los estados proveen la responsabilidad que resultará del abuso de la libertad o privilegio.

. " *          *          *          *          *          *          *

"De todas maneras no se puede sostener que bajo este derecho la prensa tenga la libertad de publicar o cualquier individuo tenga la libertad de imputar libelos y calumnias. . . ."

Al mismo efecto véase 16 C. J. S. 627, sección 213.

Esta cuestión de la limitación a la libertad de la prensa está admirablemente tratada y resuelta en el caso de *Near* v. *Minnesota*, 283 U. S. 697, 713. En este caso la Legislatura del Estado de Minnesota aprobó una ley a virtud de la cual pretendió conceder poder para suprimir cierta clase de periódicos que se dedicaban a publicar materia escandalosa y difamatoria, bajo la teoría de que eran un estorbo público *(nuisance)*. Al llegar el caso en apelación al Tribunal Supremo de los Estados Unidos y declararse que dicha legislación era anticonstitucional por violar la libertad de la prensa, dicho tribunal en una brillante opinión de su Juez Presidente Sr. Hughes se expresó en la forma siguiente:

"Si eliminamos meros detalles de procedimiento, el efecto del estatuto, en sustancia, es que las autoridades públicas pueden llevar

el dueño o editor de un periódico o revista a corte a base de un cargo de que está publicando materia escandalosa y difamatoria— específicamente que dicha materia consiste de acusaciones contra los funcionarios públicos imputándoles conducta inmoral—y a menos que dicho dueño o editor pueda presentar evidencia que satisfaga al juez de que las acusaciones hechas por él son ciertas y fueron publicadas con buenos motivos y para fines laudables, su periódico o revista será suprimido y la futura publicación del mismo se castigará como desacato. Esto constituye, en su esencia, censura.

"La cuestión a resolver es si un estatuto que permita tales procedimientos tendentes a restringir la publicación es consistente con el concepto de la libertad de la prensa como ha sido concebido y protegido a través de la historia. Al determinar el alcance de la protección constitucional, se ha considerado general si no universalmente que el propósito principal de la garantía es prohibir restricciones previas sobre la publicación. La lucha en Inglaterra dirigida contra el poder legislativo del otorgante de la licencia, culminó en el abandono de la censura sobre la prensa. La libertad que así se estableció fué descrita por Blackstone en la siguiente forma: 'La libertad de la prensa es en verdad esencial para la existencia de un estado libre, pero dicha libertad consiste en no establecer restricciones previas sobre las publicaciones, y no en inmunidad de responsabilidad por materia criminal que sea publicada. Todo hombre libre tiene un derecho innegable a presentar ante el público cualquier argumento que desee formular; si se prohibe esto, se destruye la libertad de la prensa; pero si él publica materia impropia, maliciosa o ilegal, tiene que sufrir la consecuencia de su temeridad.' 4 Bl. Com. 151, 152; véase Story *On the Constitution,* §§ 1884, 1889. La distinción entre el alcance de la libertad de prensa bajo nuestro sistema constitucional y aquella disfrutada en Inglaterra, fué indicada temprano en nuestra historia. Aquí, como dijo Madison, 'los derechos fundamentales del pueblo están protegidos contra la ambición del poder legislativo así como del ejecutivo. Están protegidos, no por leyes equivalentes a privilegios, sino por constituciones equivalentes a leyes. Esta protección de la libertad de la prensa requiere que la prensa esté exenta no sólo de restricciones previas por el ejecutivo, como en la Gran Bretaña, sino también legislativas.' Tratado sobre las Resoluciones de Virgina, Madison's Works, vol. IV, pág. 543. Esta Corte ha dicho, en *Patterson v. Colorado,* 205 U. S. 454, 462: 'En primer lugar el propósito principal de tales disposiciones constitucionales es "impedir que se

impongan las restricciones previas sobre publicaciones que habían sido impuestas por otros gobiernos "*y dichas disposiciones no prohíben el castigo subsiguiente por la publicación de aquella materia que sea considerada contraria al bienestar público. Commonwealth* v. *Blanding,* 3 Pick. 304, 313, 314; *Respublica* v. *Oswald,* 1 Dallas, 319, 325. La libertad preliminar se extiende tanto a lo falso como a lo cierto; el castigo subsiguiente puede extenderse también tanto a lo cierto como a lo falso. Éste era el estado de derecho en cuanto al libelo en su aspecto penal, imperante donde no había reglamentación estatutaria, en la mayoría de los casos y no en todos. *Commonwealth* v. *Blanding, ubi. sup.;* 4 Bl. Com. 150.'

"La crítica que se le ha hecho al comentario de Blackstone no se debe al hecho de que la inmunidad de restricciones previas sobre publicación no haya sido considerada como merecedora de énfasis especial, sino al motivo de que esa inmunidad no puede considerarse que agota el concepto de la libertad de la prensa garantizada por las constituciones estatales y federales. El motivo principal de crítica ha sido 'que la mera exención de restricciones previas no puede constituir todo lo protegido por las disposiciones constitucionales'; y que 'la libertad de la prensa podía convertirse en una burla y un engaño, y la frase misma un objeto de oprobio, si a pesar de que todo hombre tenía derecho a publicar lo que quisiera, las autoridades públicas pudieran castigarlo por publicaciones inofensivas.' 2 Cooley, *Const. Lim.,* 8th ed., p. 885. *Pero se ha reconocido que el castigo por el abuso de la libertad concedida a la prensa es esencial para la protección del público, y que las reglas del derecho común que le imponen al autor de un libelo responsabilidad por el delito, tanto como por la ofensa privada, no han sido abolidas por la protección extendida en nuestras constituciones. Id.* págs. 883, 884. *La ley de libelo en su aspecto penal descansa sobre esa base sólida.* . . . . . . . . En el presente caso, no tenemos necesidad de investigar el posible alcance del castigo subsiguiente. El Estado por medio de sus leyes sobre libelo ha concedido suficiente reparación, tanto pública como privada, por cualquier daño que el apelante haya cometido o pueda cometer a través de sus publicaciones. Según ha sido indicado, el estatuto aquí envuelto no tiene que ver con castigos; no dispone ningún castigo, excepto en caso de desacato por violación de una orden de la corte, pero sí contempla la restricción sobre la publicación a través de la supresión y el *injunction*.

"La naturaleza · excepcional de sus limitaciones da énfasis al concepto general de que la libertad de prensa, a través de la historia y desde su inclusión en la constitución federal, ha significado, principal aunque no exclusivamente, inmunidad en cuanto a restricciones previas o censura. El concepto de la libertad de la prensa en este país había sido ampliado debido a exigencias del período colonial, y debido también a los esfuerzos para independizarse de una administración opresiva. Esa libertad fué especialmente apreciada por la inmunidad que ofrecía a las restricciones previas en cuanto a la publicación de críticas en contra de funcionarios públicos y de acusaciones de mala conducta de los mismos. Como dijo el Juez Presidente Parker, en el caso de *Commonwealth* v. *Blanding,* 3 Pick. 304, 313, con respecto a la Constitución de Massachusetts: 'Además ha sido bien entendido, y aceptado como un comentario sobre esta disposición de la libertad de la prensa, que el propósito de dicha disposición legislativa fué el de prohibir todas aquellas restricciones previas sobre la publicación que habían sido puestas en vigor por otros gobiernos, y también aquí en nuestros primeros tiempos, para así cohibir los esfuerzos de aquellos patriotas que deseaban instruir a sus ciudadanos sobre sus derechos y los deberes de sus gobernantes. *La libertad de la prensa es ilimitada, pero aquel que la usare será responsable en caso de su abuso. . . . .*

"El hecho de que durante 150 años no se haya hecho casi ningún esfuerzo para imponerles restricciones previas a las publicaciones que comenten la mala conducta de funcionarios públicos, se debe al convencimiento de que tales restricciones violarían el derecho otorgado por la constitución. *Los funcionarios públicos cuyo carácter y conducta son el tema de debate y libre discusión en la prensa, tienen sus remedios contra acusaciones falsas en acciones traídas bajo las leyes de líbelo que proveen la debida reparación y castigo, y no en procedimientos encaminados a restringir la publicación de periódicos y revistas.* El principio general de que la garantía constitucional de la libertad de la prensa confiere inmunidad en cuanto a restricciones previas ha sido aprobado en muchas decisiones interpretando las constituciones estatales.

"La importancia de esta inmunidad no ha disminuído. Si bien es cierto que ataques temerarios contra hombres públicos, y esfuerzos para desacreditar a aquellos que están tratando fielmente de cumplir con sus deberes oficiales, ejercen una influencia maligna y merecen la más severa repulsa de parte de la opinión pública, no puede decirse que este abuso sea mayor, y se cree que es menor,.

que el que caracterizó el período formativo de nuestras instituciones. Mientras tanto, la administración del gobierno se ha hecho más compleja, las oportunidades para fechorías y corrupción se han multiplicado, el crimen ha adquirido proporciones alarmantes, y el peligro de su protección por funcionarios desleales y del menoscabo de la seguridad fundamental de vida y propiedad por alianzas criminales y negligencia oficial, da énfasis a la necesidad primordial de una prensa valerosa y vigilante, especialmente en las ciudades grandes. El hecho de que se abuse de la libertad de la prensa por los proveedores de escándalo no hace menos necesaria la inmunidad de la prensa en cuanto a restricciones previas cuando se trata de mala conducta de un funcionario público. *El castigo subsiguiente por aquellos abusos que pudieran ocurrir es el remedio apropiado, de acuerdo con el privilegio constitucional.*"

Nada podríamos agregar por nuestra cuenta a lo expresado por el más alto tribunal de la nación. El privilegio de la libertad de la prensa significa que no pueden ponerse trabas o restricciones previas a la prensa con el fin de evitar que publique lo que desee, y que tampoco puede tolerarse en un gobierno democrático como el nuestro la previa censura a lo que se desee publicar. Esto no significa, sin embargo, que la legislatura no tenga poder para restringir, en casos apropiados, dicho privilegio como lo ha hecho a virtud del artículo 249 del Código Penal, y si el periodista viola dicho privilegio está sujeto, como se sostiene en el caso de *Near v. Minnesota,* supra, a la acción de libelo correspondiente.

Nada encontramos en la moción de reconsideración presentada por los apelantes que nos permita variar la conclusión a que llegamos en la sentencia dictada, y como consecuencia *se declara la misma sin lugar.*