El Pueblo de Puerto Rico, demandante y apelado, *v.* Francisco C. Girona, acusado y apelante.

Núm. 7975.—*Sometido:* Diciembre 20, 1940. *Resuelto:* Julio 26, 1941.

*M. Benítez Flores, M. Cruz Horta* y *V. Rivera Colón,* abogados del apelante; *Hon. Procurador General George A. Malcolm, R. A. Gómez, Fiscal del Tribunal Supremo* y *Luis Negrón Fernández, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR TRAVIESO emitió la opinión del tribunal.

El Fiscal del Distrito de San Juan formuló acusación contra el apelante, Francisco C. Girona, por un delito de libelo, consistente en haber publicado en mayo de 1937 un libro titulado "Las Fechorías del Bandolero Trujillo," el cual circuló en la ciudad de San Juan y tendía a impugnar la honradez, integridad, virtud y buena fama del señor Rafael Leónidas Trujillo Molina, en aquella fecha Presidente de la República Dominicana. Las alegadas imputaciones difamatorias aparecen así descritas en la acusación:

"A. Página gráfica sin número (marcada 1 por el fiscal a los fines de esta acusación). Representa un fotograbado de una persona en traje de presidiario, en cuyo pie se lee: 'Rafael Valdés Trujillo, Presidente Felón de la República Dominicana, estrupador, jefe de pandillas de asaltadores, en traje de presidiario, en los años en que sus fechorías criminales no encontraban preceptos en los estatutos penales de Santo Domingo que no hubiese sido aplicado a esta sanguinaria hiena. B. Página gráfica sin número (marcada 3 por el fiscal a los fines de esta acusación). Representa la foto del cadáver de una persona mostrando heridas y al pie se lee: 'Un régimen que vive por la fuerza tiene que apelar al asesinato alevoso y cobarde. Los nobles dominicanos que levantaron su airada protesta frente a las pretensiones de Chapita encontraron segura y cobarde muerte de manos de las pandillas organizadas con ese fin por la hiena dominicana.' C. Página gráfica sin número (marcada 7 por el fiscal a los fines de esta acusación). Un grabado representando un ser humano atado a la cola de un caballo corriendo que lo arrastra, y a su pie se lee: 'Este es uno de los castigos que Chapita impone a los inconformes de su régimen atado a la cola de un corcel salvaje para ser arrastrado por llanuras empedradas hasta que el castigado encuentra su muerte perdiendo en cada sitio un pedazo de su cuerpo. Justicia de tiranuelo...' D. Página gráfica sin número (marcada 8 por el fiscal a los fines de esta acusación). Contiene un grabado mostrando la figura de una mujer desnuda acostada, y a su pie se lee: 'Una

de las diversiones sádicas de Chapita y sus esbirros más cercanos, la violación de distinguidas damas dominicanas. Y lo más doloroso es que la inmunidad más completa cubre al insolente militarote que comete la violación, y la ofendida no puede pregonar su deshonra so pena de ser muerta vilmente.' E. Página gráfica sin número (marcada 15 por el fiscal a los fines de esta acusación). Un grabado representando un ser humano colgado por los pies y atado por las manos y un hombre uniformado que le hala hacia abajo. Al margen el retrato del Presidente Trujillo, en cuya base dice 'Dios y Trujillo,' y al pie se lee: 'En nombre de ''Dios y Trujillo'' se cometen en el pueblo dominicano los más viles asesinatos. La foto muestra el castigo impuesto a un rico acaudalado dominicano, cuyos bienes fueron confiscados por Chapita.' F. Página impresa sin número (marcada por el fiscal con el núm. 17 a los fines de esta acusación), se publica lo siguiente: 'Trujillo, ratero de nacimiento.' G. Página impresa (marcada 13 por el autor del libro), se lee: 'En Mata de Palma, jurisdicción del Seybó, Chapita violó la hija de Secundino Japa. En la Ceibita, del Central Quisqueya, capturó en unión de dos oficiales más, tres muchachas, y en presencia del padre de éstas, quien fué amarrado previamente, fueron violadas.' H. En la página impresa (marcada 15 por el autor) se publica lo siguiente: 'En 1911, cuando Rafael Leónidas Trujillo era empleado del Servicio de Correos y Teléfonos del Estado, sustrajo de la oficina de Correos y Teléfonos de San Cristóbal, fondos del Estado. En 1912, Trujillo fué nuevamente perseguido y preso, en unión de su hermano Virgilio, por robo de animales; en Zorras, Buenas Colonias del Ingenio Angelina, fué preso y agredido por un agente del orden por robo de caballos. En 1918, Trujillo falsificó la firma de un señor de apellido Bernardino, del cual era empleado.' I. En página impresa (marcada 16 por el autor), se lee: 'En Paso del Medio, sección rural de San Pedro de Macorís, le violó a un señor Jiménez, tío de Raúl Mieses, una hija, y le quitó en su propia casa ochocientos pesos en efectivo.' J. En la página impresa núm. 21 (marcada por el autor) se lee: 'Abajo Trujillo, Ladrón de Vacas'.''

Celebrado el juicio ante la Corte Municipal de San Juan y convicto el acusado, apeló éste para ante la corte de distrito, y visto el caso *de novo* ante dicha corte, fué declarado culpable y condenado a pagar una multa de cien dólares o a prisión subsidiaria. Y no estando conforme, el acusado interpuso el presente recurso.

El apelante imputa a la corte sentenciadora la comisión de cincuenta errores. Los dos primeros se refieren a cuestiones previas planteadas por la defensa antes de comenzar la vista del caso. Los cuarenta y ocho restantes están relacionados con las resoluciones de la corte sentenciadora negándose a admitir evidencia ofrecida por el acusado y ordenando la eliminación de parte de las declaraciones dadas por los testigos de la defensa. Examinaremos solamente aquellos señalamientos que a nuestro juicio presentan cuestiones substanciales que puedan afectar los derechos del acusado.

██ Los artículos 245 y 246 del Código Penal vigente, leen así:

"Artículo 245.—Publicación Injuriosa Se Presume Maliciosa.— Se presumirá maliciosa toda publicación injuriosa, *si no se probare que hubo motivo justificable para hacerla.* (Itálicas nuestras.)

"Artículo 246.—Cuando la Verdad es Defensa.—En todos procesos promovidos por libelo, se podrá testificar la verdad ante el tribunal o jurado, y si éste estimare ser cierto lo denunciado como infamatorio, y haberse publicado con sana intención y para fines justificables, deberá absolverse libremente al acusado; incumbiendo al jurado determinar las cuestiones de hecho y de derecho."

La prueba testifical ofrecida por el acusado tendía a establecer las dos defensas permisibles bajo los dos citados artículos, o sea que él tuvo un motivo justificable para publicar el libro; y que los hechos por él publicados son ciertos.

En el cuarto señalamiento se imputa a la corte inferior el error de haber eliminado del récord la contestación dada por el testigo Dr. Leovigildo Cuello a una pregunta de la misma corte. La contestación eliminada decía así: "Le puedo asegurar a la corte que bajo el régimen de Trujillo se han cometido más atropellos y más crímenes que los relatados en este libro."

El Dr. Cuello, dominicano, médico-cirujano de la Universidad de París, declaró sobre el asesinato en San José de las Matas, Santo Domingo, del Sr. Virgilio Martínez Reina y de su esposa, por una banda de hombres, por orden expresa del

General Trujillo; que entre los asaltantes había personas que ocupan puestos de distinción en el Gobierno, en el Ejército y en la Policía de Santo Domingo. Al preguntarle la corte si esos hechos le constaban de conocimiento personal, contestó;

"Bueno, si la corte me permite, hay que darse cuenta de la situación anormal en Santo Domingo y que las afirmaciones que pueda hacer respecto a ese crimen, yo no podría aportar prueba evidente directa de los hombres que tomaron participación en ese hecho criminal. Lo que sí puedo asegurar a esta corte es que se reunieron en la Fortaleza de Santiago de los Caballeros y salieron bajo las órdenes de un teniente del Ejército hacia San José de las Matas, y se reunieron en la residencia del entonces Senador Torres,..."

Siguió declarando que él no presenció la reunión, pero sí vió los heridos y examinó el cadáver de Virgilio Martínez Reina; que presentaba 68 heridas de puñal, cuchillo y balas de revólver y una de machete que le cercenó casi por completo la cabeza; que la señora falleció al llegar a la clínica del declarante y presentaba tres heridas mortales; que dos días antes de ser asesinados, los esposos Martínez Reina, quienes estaban en su clínica, la abandonaron al ser informados de que había un complot para matarlos, y Martínez Reina para no comprometer al declarante decidió irse a San José de las Matas a convalecer de un ataque agudo de apendicitis que acababa de sufrir; que la persona que les informó sobre la existencia del complot fué el General Desiderio Arias, "hoy muerto también." La corte sostuvo la objeción del fiscal, diciendo: "La mejor prueba sería la declaración de la persona que le dió esa referencia."

Continuó declarando el Dr. Cuello, que cuando la señora Martínez Reina llegó a la clínica tenía su conocimiento muy vago y pedía al cielo que perdonara a los asesinos, y al llevarla a la sala de operaciones falleció; que en Santo Domingo no se asesina así si no es por orden de . . . (el testigo no pudo continuar, por haberse opuesto el fiscal y la corte

sostenido la objeción). Preguntado por la defensa si se había practicado alguna investigación de ese hecho, contestó el testigo: "Nunca hay investigaciones en los asesinatos ordenados por Trujillo"; y acto seguido la corte ordenó la eliminación de la contestación por ser una conclusión del testigo. Siguió declarando y dijo: que ha leído el libro publicado por Girona. El incidente que ha motivado el cuarto señalamiento, copiado del récord, fué el siguiente:

"P. Vamos a cambiar la pregunta. ¿Usted puede asegurarle a la corte si los hechos que han ocurrido en la República Dominicana durante la presidencia de Trujillo están relatados en este libro fielmente o se han exagerado en alguna forma?

"Fiscal: Me opongo porque el testigo ha manifestado los hechos que él conocía. Mal puede el testigo decir ahora si eso es cierto o no, a no ser que sea a base de una opinión personal del testigo.

"Juez: La corte va a sostener la objeción porque la pregunta está hecha en términos generales. Ante la corte no están todos los hechos ocurridos en Santo Domingo. La contención aquí es que se trata del libelo por hechos relatados por el acusado en un libro, y eso es lo que quiere probar, que son ciertos, para justificar su intención y destruir la malicia.

"Sr. Benítez Flores: Ese libro ha sido presentado en evidencia por el fiscal y nosotros lo que le preguntamos ahora es si esos hechos son ciertos o no.

"Juez: Si al testigo le consta de propio y personal conocimiento que conteste, pero si lo que va a contestar lo contesta a través de información de otras personas, es eliminable.

"R. Le puedo asegurar a la corte que bajo el régimen de Trujillo se han cometido más atropellos y más crímenes que los relatados en este libro.

"Fiscal: Solicito que se elimine eso.

"Juez: Se elimina, sí. Se sostiene la objeción.

"Sr. Benítez Flores: Con nuestra excepción.

"P. Doctor, por el conocimiento que usted tiene de este libro y por el conocimiento personal que tiene de la República Dominicana durante la presidencia de Trujillo, ¿lo que se relata en este libro es la verdad o no es la verdad?

"Fiscal: Ya contestó eso.

"Juez: Que conteste. La corte quiere aclarar que el fiscal tiene en sus manos el contrainterrogatorio y toda la prueba que sea de referencia la puede eliminar.

"R. No de propio conocimiento, pero quiero hacer constar que lo que considero de dominio público y ha llegado hasta mi conocimiento, en lo que se refiere a crímenes, asesinatos políticos y atropellos, es cierto eso.

"Fiscal: No lo sabe de propio conocimiento.

"Juez: Habiendo manifestado el propio testigo que su conocimiento de estos hechos es de referencia porque son de dominio público y que no le constan de propio y personal conocimiento, la corte ordena que se eliminen del récord.

"Sr. Benítez Flores: Excepción."

Declaró por último el Dr. Cuello que él permaneció en Santo Domingo como un mes más después del asesinato de los esposos Martínez Reina; que no se tomó interés en investigar los sucesos, porque temía le aconteciera lo mismo; que no les interesaba saber qué se había hecho por parte del Gobierno, porque ellos sabían que había sido el Gobierno y "porque la familia tenía el convencimiento de que los había asesinado Trujillo"; que no se procesó a nadie. La corte, a moción del fiscal, ordenó la eliminación de la parte referente a Trujillo y eliminó también, por considerarla inmaterial, la declaración del testigo en cuanto al hecho de que no se procesara a nadie por el doble asesinato.

Declaró el Dr. Juan Isidro Jiménez Grullón y en substancia dijo:

Que conoció a Daniel Ariza, quien murió en la Prisión de Nigua; que ésa es una de las prisiones donde el régimen de Trujillo encierra a los prisioneros políticos; que Ariza murió frente a sus ojos, "víctima de una pela dada por la culata de un guardia"; que él y los demás presos políticos fueron encerrados en pequeñas celdas, de 3 metros de largo por 3½ de ancho, denominadas "solitarias," y despojados de sus ropas; que el día que murió Ariza habían estado trabajando en el desyerbo y como los guardias tenían órdenes de no dejarlos ni respirar, cada vez que se sentían fatigados

los guardias les amenazaban con las bayonetas; que no hay duda de que la muerte de Ariza fué positivamente causada por los golpes de culata que le dió el guardia. Del récord aparece el siguiente incidente:

"Fiscal: Yo tengo verdadera satisfacción en oír al testigo, una persona distinguida, pero los sitios a que se refiere el testigo no son de los alegados en la acusación, y es inmaterial.

"Juez: Lo que el fiscal pide que se elimine es la forma en que murió y el trato que le daban allí, porque es inmaterial e impertinente y la corte cree que es impertinente... Si esa cuestión que está declarando el testigo no tiene relación con los hechos alegados en la acusación, debe eliminarse. Ya él había manifestado el trato que le daban. Lo demás es inmaterial. Se elimina. Adelante."

Siguió declarando el testigo, que presenció cuando llevaron a algunos de sus compañeros a ser fusilados, pasándolos frente a su celda para llevarlos a "Camaguí," sitio destinado a hacer funciones de cementerio; que de ese modo presenció el fusilamiento de Vitalino Pimentel y el de un joven argentino; que le llamó la atención que el régimen no se circunscribiera al elemento dominicano, sino también a puertorriqueños como Colón Piris; y que más tarde él constató el fusilamiento de un austríaco. Pidió el fiscal que se eliminara lo declarado por el testigo. Copiaremos del récord.

"Fiscal: Solicito que se elimine la declaración del testigo.

"Juez: Se elimina la parte a que él se refiere que aquello es un cementerio y allí fusilaron a esas personas y que después constató.

"Fiscal: Y también lo del argentino y lo de Pimentel.

"Testigo: Yo los vi pasar.

"Juez: El hecho del fusilamiento, ¿lo dedujo por el hecho de que pasó?

"R. Sí, señor.

"P. ¿Es una deducción?

"R. Sí, señor. Allí en Nigua se acostumbra con anterioridad al acto del fusilamiento sacar las palas y los picos de la celda número 6 que era donde yo me encontraba. Y esa tarde sacaron las palas y los picos para cavar el hoyo y esa misma noche escuchamos la descarga y al otro día recibimos la confirmación del hecho por los propios guardias que lo ejecutaron. Un récord oficial no lo tengo.

"Juez: Por esa razón es que la corte ordena la eliminación porque es todo de referencia. La corte entiende que en verdad todas son deducciones más o menos del testigo. La corte no quiere decir que no tenga su fundamento, pero la corte no tiene duda ninguna de que él solamente está hablando por información que le han dado y por lo tanto entiende que es *hearsay evidence* y ordena su eliminación.

"Sr. Benítez Flores: Tomamos excepción.

Continuó declarando el Dr. Jiménez Grullón, así: que después del fusilamiento no vió el cadáver de Pimentel, pero no volvió a verlo vivo en la cárcel de Nigua; que antes del fusilamiento lo veía numerosas veces, cada vez que lo sacaban de la celda a latigazos, casi diariamente; que después que lo sacaron de su celda y sintió la descarga y los guardias le dijeron que lo habían fusilado no volvió a ver a Pimentel; que vió azotar a numerosos presos en la cárcel de Nigua, especialmente al Dr. Ramón de Lara, a Félix María Ceballos, a Daniel Ariza, a Maduro Piña y a muchos más que no puede mencionar porque están en aquel país y su declaración podría perjudicarles; que los azotes se realizaban más o menos como lo indica el grabado del Sr. Girona; que para azotar a los presos se usaban dos clases de instrumentos, el vergajo de toro y un alambre eléctrico con nudos, al que llamaban "canta claro" porque se usaba para obligar a los presos a hacer declaraciones verdaderas o falsas; que cada vez que se iniciaba una investigación los presos eran azotados primero y luego se les llevaba ante la Comisión Militar; que él constató esos azotes; que Félix María Ceballos tiene en sus espaldas las cicatrices de esos azotes; que otro joven de apellido Sánchez recibió "azotes patéticos" y fué conducido a la celda del testigo con las espaldas deshechas por el látigo de que fué víctima.

A moción del fiscal, la corte inferior ordenó la eliminación de todo lo declarado por el Dr. Jiménez Grullón sobre los azotes y suplicios sufridos por los prisioneros, por ser impertinente, toda vez que esos actos fueron realizados "por

personas extrañas a la persona que ha sido injuriada de acuerdo con las alegaciones de la denuncia.'' Y sigue hablando el récord:

"Sr. Benítez Flores: Señor juez, todo lo que dice este libro no se refiere a hechos realizados personalmente por Trujillo sino por sus agentes y bajo su régimen, bajo su Gobierno.

"Juez: La acusación ya lo dice claramente: en relación al libro que publica y en donde ha sido difamado, y después la especificación de los hechos. Se elimina de la declaración del testigo todo lo que se refiere a estas palizas. De acuerdo con la propia acusación y en la página 7 del libro en donde se manifiesta que el castigo que el libelado imponía, como ésta es una imputación directa al señor Trujillo, todas las demás cuestiones que hayan hecho sus oficiales, no son realizadas por él. La corte resuelve eliminar la declaración por ser inmaterial e impertinente.

"Sr. Benítez Flores: Tomamos excepción.''

Siguió declarando el testigo: que presenció el encierro del Dr. Lara en la "solitaria'' y cuando fué azotado; que le tuvieron unos 50 días en "solitaria,'' casi desnudo. Se ordenó la eliminación y la defensa anotó su excepción. Solicitó la defensa la reconsideración, basándose en que a la página 93 del libro de Girona aparece un capítulo entero que se refiere al "Vía Crucis del Dr. Lara,'' y que habiendo presenciado ese vía crucis el Dr. Jiménez Grullón, su declaración es necesaria para probar la veracidad de esos hechos. La reconsideración fué denegada, anotándose la excepción correspondiente.

Declaró el testigo que conoció al Dr. Eduardo Vicioso, quien estuvo junto con él en la prisión de Nigua. Se opuso el fiscal y la corte sostuvo la objeción. Tomó excepción la defensa e hizo constar que el Dr. Jiménez Grullón había presenciado los azotes y las torturas de que había sido víctima el Dr. Vicioso, y que su declaración era necesaria para justificar lo publicado en el libro y la falta de malicia al publicarlo. La corte ratificó la exclusión del testimonio, diciendo:

"La corte ha sostenido que esa prueba, como no se refiere directamente al Sr. Trujillo, que es la persona contra quien se ha publicado

el libelo, y la persona que se alega ha sido difamada, ésos son hechos que de probarse serían impertinentes, irrelevantes e inmateriales en cuanto al caso que se está ventilando.''

En igual forma se prohibió al testigo declarar lo que sabía sobre la prisión, tortura y muerte del prisionero León Reinosa, en la cárcel del ''Homenaje.''

Describiendo el régimen de vida a que estaban sometidos los prisioneros en la cárcel de Nigua, dijo: que se les obligaba a trabajar desde las 6 de la mañana hasta las 6½ de la tarde; que mientras trabajaban no se les permitía ninguna clase de vestidos; que trabajaban bajo la continua vigilancia del centinela, quien les amenazaba con la culata del rifle si trataban de mitigar la fatiga; y que a las 11:30 de la mañana les llevaban al comedor y les obligaban a comer con las manos sucias por la tierra en que trabajaban constantemente. La corte ordenó la eliminación por ser impertinente, tomando excepción la defensa.

Transcribimos del récord el resto de la declaración del Dr. Jiménez Grullón:

''P. ¿Usted sabe quién es el Jefe del Ejército de la República Dominicana?

''R. ¿Actualmente?

''P. Sí.

''R. Actualmente es un hermano del Dictador Trujillo, un señor llamado Bienvenido Trujillo.

''P. ¿Y en la época en que estaba usted en Nigua?

''R. Al principio el señor General José García y después el General Federico Fiallo, una verdadera hiena.

''Fiscal: Que se elimine la última manifestación del testigo.

''Juez: Que se elimine del récord eso de que es 'una verdadera hiena.' Y la corte va a solicitar que no se haga ninguna clase de manifestaciones de esta naturaleza.

''P. ¿No es cierto que de acuerdo con la Constitución el Jefe del Ejército es el Presidente y que ésos son jefes accidentales?

''Fiscal: Ésa no es la evidencia que la ley exige para probar quién es el Jefe del Ejército.

''Juez: Se sostiene la objeción.

"P. ¿Esas personas que usted ha mencionado son parte del régimen de Trujillo?

"R. Sí, señor.

"Fiscal: Que se elimine.

"Juez: Se elimina.

"P. ¿Y todos los oficiales de las cárceles de Nigua que usted ha mencionado aquí, no forman parte del régimen de la República Dominicana?

"R. Sí, señor.

"P. ¿Y lo formaban cuando usted estaba allí?

"R. Sí, señor.

"Fiscal: Que se elimine porque aquí no se está atacando a un régimen.

"Juez: Se sostiene la objeción y se elimina la declaración.

"Sr. Cruz Horta: Excepción.

"Sr. Benítez Flores: El fundamento de la excepción es que de la propia acusación el fiscal alega en ella, entre otras cosas, en la página primera, letra 'B,' como fundamento de su acusación por libelo contra Girona y como tomado del libro que él presentó en evidencia, estas palabras: 'Un régimen que vive por la fuerza tiene que apelar al asesinato alevoso y cobarde, etc.' Y si el fiscal alega en esta acusación como motivo de libelo que se publicó en un libro un ataque contra el régimen, es admisible la evidencia que tratamos de traer para probar que esos hechos son verdad. La defensa desea anunciar ahora, señor juez, que con el propósito de no entorpecer los procedimientos y en vista de las resoluciones de esta corte en relación con las distintas preguntas que se han hecho a este testigo, todas tendientes a demostrar la falta de malicia por parte del acusado Girona, por el hecho de que todas tienden a probar la verdad de lo relatado en el libro, y para no tener que seguir repitiendo ese interrogatorio recayendo siempre la misma resolución hasta ahora, y que esta defensa considera que es contraria a los fines de la defensa y con todo el respeto a esta corte errónea, nos abstenemos de continuar preguntando a este testigo que habría de declarar sobre extremos de la misma naturaleza, y nada más con el testigo.

"Juez: Receso hasta mañana a las 9:00 de la mañana."

Las eliminaciones decretadas y las resoluciones dictadas en relación con el testimonio del Dr. Jiménez Grullón constituyen la base de los señalamientos numerados del 6 al 13, ambos inclusive.

Fué llamado a declarar el Dr. Miguel Angel Pardo, dominicano, médico-cirujano, quien ejerce su profesión en los Hospitales Municipales de San Juan. Preguntado sobre cuál fué el motivo que tuvo para salir de Santo Domingo, se opuso el fiscal por ser inmaterial y la corte no permitió que contestase la pregunta, tomando excepción la defensa. Preguntado: ''¿Estuvo usted preso en la República Dominicana durante el régimen de Trujillo?,'' se opuso el fiscal por ser inmaterial y porque ''no se alega nada en relación contra este testigo.'' La corte, sin saber qué es lo que ha de declarar el testigo, dicta la siguiente resolución:

''Juez: La corte entiende que la evidencia debe ajustarse a las alegaciones. No debe tener relación remota sino una relación directa. Si los hechos que intenta probar el acusado se refieren a los hechos denunciados, la corte cree que si se intenta probar con el testigo la veracidad de los hechos denunciados, es impertinente e inmaterial el hecho de que estuviera preso. Él ha declarado que estaba en Santo Domingo cuando el régimen. Entonces él puede declarar sobre los hechos que haya visto en relación con las alegaciones de la denuncia.

''Sr. Benítez Flores: Vamos a tomar excepción.''

Declara por fin el Dr. Pardo, y dice: que estando él preso en la cárcel de Nigua vió al Presidente Trujillo ''personalmente azotar presos políticos delante de mí estando yo preso''; que entre los azotados personalmente por Trujillo recuerda al Lic. Ramón Valdés, Carlitos Alvarez, el Dr. Raymond, el ex senador Abigaíl del Monte y Juan Cedó; que en el grupo estaban además el Dr. De Lara, Fabio Fiallo, Gautier y el declarante, ''que no fuimos azotados.'' Preguntado el testigo por la defensa si conoció en la República Dominicana a la señorita Celeste Castillo, se opuso el fiscal alegando que era inmaterial. Informó la defensa que se trataba de uno de los casos de violación a que se hacía referencia en la denuncia como imputados a Trujillo. Y la corte, sin permitir siquiera que el testigo dijese si conocía o no a la Srta. Castillo, sostuvo la oposición del fiscal, resolviendo:

"Si la corte permitiera esa pregunta establecería el hecho de la violación y la corte no debe permitir que se hable de la reputación de personas que resultaren perjudicadas con esa pregunta y la corte entiende que ésa no es la manera de probarse esto. Sostenida la objeción."

Después de numerosos e innecesarios incidentes, continuó el Dr. Pardo diciendo: que conoció a Celeste Castillo y que está muerta. Preguntado "¿La vió usted morir?," se opuso el fiscal, y la corte excluyó la pregunta, diciendo: "Pero hay que verla fallecer para verla morir y entonces debe traer el acta de defunción." Tomó excepción la defensa, y el testigo continuó declarando: que él asistió a la Srta. Castillo, como médico, de un balazo que ella misma se dió; que cuando la vió estaba gravísima, cercana a la muerte. De acuerdo con el récord, siguió el siguiente interrogatorio:

"P. ¿En esos momentos le hizo algunas manifestaciones relativas a Trujillo?

"Fiscal: Me opongo porque es inmaterial.

"Juez: La corte sostiene la objeción del fiscal por ser inmaterial e impertinente y además por ser declaraciones de referencia. No está en *issue* la cuestión de lo que a ella le haya ocurrido con otra persona.

"Sr. Cruz Horta: Voy a establecer la materialidad de esta declaración a la corte. Voy a probar que Trujillo violó en un baile a esta señorita y eso lo voy a probar mediante el *dying declaration* de ella.

"Fiscal: No es admisible.

"Sr. Cruz Horta: Ése es un elemento para probar una violación, es indudable.

"Juez: No está en *issue* la violación.

"Sr. Cruz Horta: Voy a probar que en momentos en que ella sabía que se iba a morir y la atendía al efecto el testigo, manifestó que Trujillo la había violado y que por eso se pegó un tiro.

"Fiscal: Que se elimine. Es inmaterial.

"Juez: Se elimina. En cuanto a lo que dice el compañero porque se lo manifestó una persona. Él no ha visto el acto y lo que la corte dice que debe probarse es el hecho. Si él vió el acto de la violación entonces sería...

"Sr. Cruz Horta: En una cadena de hechos tendientes a establecer el acto de la violación estoy probando un hecho que precisamente

tiende a probar esa violación. ¿La corte deniega cualquier prueba sobre ese asunto?

"Juez: No, la corte sòstiene las objeciones si son fundadas. La corte no puede adelantar nada.

"P. ¿Qué manifestaciones le hizo esta señorita si alguna le hizo relacionada con Trujillo?

"Fiscal: Me opongo.

"Juez: Sostenida la objeción.

"P. ¿Hizo alguna manifestación en relación con algún acto carnal realizado en ella por Trujillo?

"Fiscal: La misma objeción.

"Juez: Se sostiene la objeción."

Continuó el testigo: que conoció la organización generalmente conocida por "la 42"; una partida de bandoleros, un grupo organizado para dar golpes y matar si era necesario de acuerdo con las instrucciones que tenía de Trujillo; que oyó dar esas instrucciones cuando estaba preso en la Fortaleza; que oyó cuando Trujillo llamó a Miguel Angel Palomena, que era su segundo, y le dijo: "Vayan a buscar a fulano de tal y tráiganlo aquí vivo o muerto"; que esa pandilla no fué la que mató a Virgilio Martínez Reina y sí otra organizada en Santiago de los Caballeros por instrucciones de Trujillo; que eso es de dominio público (eliminado); que José Estrella, Delegado del Gobierno en el Cibao, tenía que ver con la pandilla de Santiago. Trató la defensa de probar con la declaración del Dr. Pardo la reputación general del Sr. Trujillo en Santo Domingo, se opuso el fiscal y la corte no permitió que se dijese nada sobre el particular, por considerar que era inmaterial e impertinente. La defensa tomó excepción.

Los señalamientos números 14 a 21 inclusive se relacionan todos con el testimonio del Dr. Pardo.

Fué llamado a declarar el Lic. Guaroa Velázquez, abogado, profesor de derecho y en varias ocasiones representante diplomático de la República Dominicana. Después de numerosas objeciones de parte del fiscal, todas ellas sostenidas por la corte, ésta no permitió que el testigo declarase

que de acuerdo con la Constitución Dominicana, el Presidente de la República—como todos los presidentes de todas las repúblicas—es el Jefe Supremo del Ejército Nacional.

Declaró el testigo Sr. Velázquez: que en Santo Domingo la palabra "pandilla" significa un grupo de hombres armados que se reúnen para cometer fechorías; que conoció allí la pandilla llamada "la 42," de la que era Jefe el Dr. Paulino, un tal Miguel Paulino, a quien él conocía mucho; que Paulino obedecía órdenes de Trujillo; que el 18 de mayo de 1930 supo que "la 42" estaba en las inmediaciones de su hogar; que vió a "la 42" y a un pelotón del ejército al mando del capitán Vallejo y un automóvil del ejército dentro del cual estaba Trujillo; que el pelotón penetró en la casa y les pusieron las carabinas en los pechos, y "la 42" hizo disparos dentro de la casa; que cogieron a su padre, quien era candidato a la Presidencia de la República, y se lo llevaron preso a la Fortaleza; que esa misma tarde fué acompañado de su suegro el Dr. Soler a radicar una petición de hábeas corpus en favor de su padre, y al regresar a su casa encontraron a "la 42" en el zaguán y la acera; que Paulino, que había sido sirviente del Dr. Soler, se acercó a éste y le dijo que sacara de allí a su hija porque tenía órdenes de Trujillo de ir contra el hogar (la corte ordenó la eliminación de lo dicho por Paulino a Soler, por ser de referencia); que cuando se dió cuenta de que la pandilla estaba cerca de su casa, él fué a la esquina en las inmediaciones de su casa, y vió en medio de su casa a un pelotón de soldados bajo el mando de Vallejo, a "la 42," y a Trujillo en un automóvil del Ejército; que "la 42" se estacionó frente a la casa y a todos los que entraban o salían le propinaban fuetazos, macanazos o patadas; que el 17 de mayo de 1930, encontrándose el declarante en la Corte de Apelaciones, presenció cuando "la 42" invadió el recinto de la corte en actitud amenazante para los jueces que iban a dictar el fallo sobre el proceso electoral; y que así resultó electo Trujillo.

La defensa, después de haberlos identificado debidamente, ofreció en evidencia, como fuentes de información que había tenido el acusado para la publicación de su libro, los siguientes documentos:

1. Copia de la edición de mayo 23, 1935, del *magazine* "The Nation," de Nueva York, en el que aparece un artículo del Dr. Ernest Gruening titulado: "La Dictadura en Santo Domingo."

2. Copia de la edición de enero, 1938, de la Revista "American Current History," que contiene un artículo del Sr. Carlton Beals, titulado "El César del Caribe."

3. Copia de un informe de la "Hollen Social," que contiene un informe del Sr. Charles A. Thompson de fecha abril 15, 1936.

4. Copia de la edición de 25 de agosto de 1938 de la revista "Ken," que contiene un artículo del Sr. Alfred A. Simms relativo al régimen imperante en Santo Domingo.

5. Un número de "Colliers," de fecha 22 de enero de 1938, con un artículo del Sr. Kingston Reynolds, sobre la situación en la República Dominicana.

6. Copia de la revista "Los Quijotes," publicada en San Juan, P. R., de fecha julio 17, 1937, con un artículo del Dr. Jiménez Grullón, titulado "La Vergüenza Dominicana en el Exilio"; y otra copia de la misma revista, de agosto 31, 1937, con otro artículo titulado "La Ciencia Contra la Tiranía Trujillesca."

7. Tres artículos publicados también en "Los Quijotes," titulados "Roosevelt y las Tiranías," "El Presidente Trujillo Juzgado por sus Leales Subalternos" y "Un Nuevo Calígula Indígeno," publicados en abril 20, 1938.

Todos y cada uno de dichos documentos fueron rechazados por la corte, por el solo fundamento de que la mejor evidencia sería las declaraciones de los autores de los artículos. La defensa anotó las correspondientes excepciones.

Para no hacer demasiado extensa esta opinión nos abstendremos de hacer una relación de los numerosos incidentes, idénticos o semejantes a los ya relacionados, ocurridos durante la presentación del resto de la prueba de descargo.

No es nuestra misión resolver dentro de este proceso si los hechos denunciados por el acusado en el libro por él publicado, han sido o no probados, ni tampoco expresar opinión alguna en cuanto a los hechos que hayan podido ocurrir en la República Dominicana durante y bajo la Presidencia del General Trujillo.

Nos encontramos frente a un caso excepcional. Una acusación por libelo contra la persona de un Jefe de Estado, a quien se imputa la comisión de numerosos actos delictivos y se le acusa de tener sometido a su pueblo a un régimen de gobierno dictatorial y tiránico, "que vive por la fuerza y tiene que apelar al asesinato alevoso y cobarde." En la cuidadosa búsqueda de jurisprudencia que hemos practicado, sólo hemos encontrado el caso de *People* v. *Fornaro,* 65 Misc. (N. Y.) 457, citado por el fiscal, por un libelo contra un Senador de Méjico. Lo único que se sostiene en dicho caso es que el delito de libelo puede cometerse contra una persona no residente dentro del Estado. En el caso de autos la denuncia no ha sido radicada por el Sr. Trujillo, ni por uno de sus parientes, ni siquiera por un dominicano residente en esta Isla que pudiera sentirse agraviado por las ofensas al Jefe Ejecutivo de su país. Según consta de los autos, la denuncia fué formulada por persona residente en el país, sin que aparezca que dicha persona actuara en representación o por orden del Sr. Trujillo.

El propósito que se persigue al castigar el libelo es evitar las alteraciones del orden y los actos de violencia que pudieran ocurrir si el libelado no encontrase protección en las cortes de justicia. Esos peligros no son aparentes cuando la persona contra quien van dirigidas las ofensas no reside en el país donde se ha hecho la publicación. Por eso vemos

que ni el Sr. Trujillo, ni sus familiares, ni su representante consular en esta Isla se ocuparon de formular una denuncia contra Girona, como tampoco la formularon contra ninguno de los autores de los artículos ofrecidos en evidencia y no admitidos por el tribunal inferior. Los hombres capaces por su inteligencia o por su osadía para convertirse en conductores de pueblos o en tiranos, se refugian en.la tranquilidad de su conciencia cuando son inocentes o se escudan cínicamente tras la irresponsabilidad de que gozan, cuando son culpables. Por regla general, ni los inocentes ni los culpables formulan denuncias contra sus detractores.

No tenemos dudas en cuanto a que las imputaciones contenidas en la denuncia son libelosas *per se*. El fiscal no estaba obligado a probar la malicia, pues ésta se presume por el mero hecho de la publicación. La ley, sin embargo, provee que una vez probado el hecho de la publicación y establecida como consecuencia de ese hecho una presunción *juris tantum* de malicia, el acusado puede controvertir esa presunción mediante prueba de que hubo un motivo suficiente para justificar la publicación y de que los hechos que se imputan en la publicación libelosa son ciertos. La regla del derecho común, que declaraba que la verdad era inadmisible como defensa en un proceso criminal por libelo, ha sido derogada por estatutos federales y por disposiciones constitucionales y estatutarias en todos los estados.

En el caso de autos el acusado ofreció evidencia tendiente a establecer la verdad de los hechos publicados en su libro y el motivo, justificable, que tuvo para publicarlo. La única cuestión que debemos considerar y resolver es si la corte erró al decretar las eliminaciones arriba relacionadas, y en caso afirmativo, si el error o errores cometidos afectaron derechos substanciales del acusado.

Considerada en conjunto la transcripción de la evidencia, de ella surge un error fundamental, fuente y origen de todos los errores individuales cometidos por la corte inferior. Ce-

rrando los ojos ante la realidad e ignorando hechos de los cuales podía y debía tomar conocimiento judicial, procedió la corte sentenciadora a juzgar el caso como si los hechos que habían de investigarse hubiesen ocurrido en el seno de nuestra comunidad insular y no en un país extranjero, regido por leyes distintas a las nuestras y sometido a un régimen de gobierno distinto al nuestro. Ni la horripilante descripción que del impune asesinato de Virgilio Martínez Reina y de su esposa, próxima a ser madre, hiciera el Dr. Cuello; ni el patético relato que hiciera el Dr. Jiménez Grullón, describiendo las flagelaciones, las torturas y suplicios y los fusilamientos de prisioneros políticos en las prisiones de Nigua y del Homenaje; ni la descripción del vía crucis de Ariza, muerto a golpes de culata por un brutal centinela; ni el espeluznante espectáculo de un ser humano arrastrado por un caballo por la carretera, descrito por un testigo ocular; ni el hecho fundamental de que ninguno de esos delitos fué investigado y nadie fué procesado o castigado por su comisión, fueron suficientes para abrir los ojos del juzgador y hacerle comprender que el caso presentaba una de esas situaciones anormales en las que, eclipsada la libertad y abolidas las garantías constitucionales, sólo impera la voluntad y el capricho del que manda. Y ateniéndose estrictamente al tecnicismo de la ley, la corte sentenciadora fué eliminando uno tras otro todos los testimonios referentes a suplicios, torturas y asesinatos de prisioneros políticos, cometidos en cárceles y por funcionarios del Gobierno, por entender que todos esos relatos eran inmateriales, impertinentes e inadmisibles, y que la única prueba admisible sería aquella que conectase directamente al Jefe del Gobierno bajo el cual se cometieron tales crímenes impunemente, con los guardianes y centinelas. De acuerdo con el criterio de la corte sentenciadora, según se desprende de sus resoluciones, la única prueba admisible sería la declaración del subalterno, confesando el delito y delatando a su superior.

■ El error cometido al no permitir que el Dr. Pardo declarase sobre las manifestaciones que momentos antes de morir le hiciera la señorita Castillo, con referencia a la violación de que había sido víctima, es manifiesto y perjudicial al acusado. Según se desprende de lo declarado por el Dr. Pardo, la joven Castillo al verse deshonrada dispuso de su vida disparándose un tiro de revólver. El testigo la asistió como médico y trató de salvarla. Momentos antes de expirar, la joven víctima hizo a su médico manifestaciones que no conocemos por no haber permitido la corte inferior que el testigo las relatara. Dichas manifestaciones no eran admisible como "dying declarations," las que sólo pueden ser admitidas en casos de homicidio. Pero sí lo eran, a nuestro juicio, como parte del *res gestae,* tanto más cuanto que habían sido hechas por la declarante en el momento solemne de enfrentarse con la muerte.

La táctica seguida por el fiscal para obstaculizar al acusado en sus esfuerzos para probar sus defensas, táctica en la que fué sostenido por la corte, con raras excepciones, resalta claramente de los siguientes incidentes que copiamos del récord:

"P. ¿El Sr. Trujillo ocupaba algún cargo público cuando usted estaba allí?

"Fiscal: La mejor prueba sería el nombramiento.

"Juez: ¿En qué fecha?

"Abogado: En la época en que él estaba en Santo Domingo.

"P. ¿Sabe si el Sr. Trujillo ocupaba algún cargo público en la fecha en que usted estaba en Santo Domingo?

"Fiscal: Yo creo que la mejor manera de probar la existencia de un cargo, es de otra manera.

"Juez: Puede contestar.

"R. Era el Presidente de la República.

"Fiscal: Ya declaró. *Está bien.*

"Juez: Se sostiene la objeción."

(T. de E. págs. 112 y 113)

Cabe aquí preguntar: ¿si el fiscal ha aceptado la contestación del testigo, diciendo "Ya declaró. Está bien," qué

objeción es la que sostuvo la corte? Y añadiremos, que la defensa no estaba obligada a probar el hecho de que el Sr. Trujillo fuera el Presidente de la República, pues ese era un hecho alegado en la acusación.

Y más adelante:

"P. ¿Como tal Presidente de la República, el Presidente Trujillo, si a usted le consta....

"Fiscal: Me opongo.

"Juez: Con lugar la objeción.

"Abogado: Excepción."

(T. de E. pág. 113)

Preguntamos: ¿a qué y por qué se opuso el fiscal, si el abogado defensor no había acabado de formular su pregunta? ¿Por qué sostuvo la corte una objeción no fundada, contra una pregunta que aún no se había formulado? Podríamos citar varios incidentes similares ocurridos durante la vista del caso. Bastan los citados y los errores que hemos discutido para llevarnos a la conclusión de que el acusado apelante no tuvo el juicio justo e imparcial a que tenía derecho de acuerdo con las leyes vigentes.

Somos de opinión que en procesos de esta naturaleza, la corte debe conceder al acusado una amplia y liberal oportunidad para establecer sus defensas, suavizando hasta donde fuere legalmente posible el rigor de las reglas de evidencia, con el único fin de llegar al descubrimiento de la verdad.

La confirmación de una sentencia dictada bajo las condiciones que hemos descrito, haría posible la persecución, proceso y castigo de todos aquellos que, como Ernest Gruening, Oswald Garrison Willard, Carlton Beals, Charles A. Thompson, Alfred A. Simms, Kingston Reynolds, Alfred H. Sinks y otros, imputaron a Trujillo los mismos hechos que le imputara Girona. Y fácil sería entonces el proceso y el castigo de todos los que en diarios y en revistas y desde las tribunas y por la radio denuncian a la humanidad los crímenes de dictadores y tiranos, pues ninguno de ellos podría probar

la verdad de los hechos con certificados oficiales o confesiones de sus ejecutores directos.

*La sentencia recurrida debe ser revocada y absuelto el acusado.*

El Juez Asociado Sr. Todd, Jr., no intervino.