El Pueblo de Puerto Rico, demandante y apelado, *v.* Prensa Insular de Puerto Rico y Antonio Ayuso Valdivieso, acusados y apelantes.

Núm. 13238.—*Sometido:* Diciembre 1, 1948. *Resuelto:* Marzo 18, 1949.

*Juan B. Soto, Félix Ochoteco, Jr., Guillermo Cintrón Ayuso, Luis E. Dubón* y *Juan F. Soto,* abogados de los apelantes; *Hon. Procurador General Vicente Géigel Polanco (Luis Negrón Fernández,*

*Ex Procurador General,* en el alegato), *José C. Aponte, Fiscal Especial General* y *J. Rivera Barreras, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

El Juez Asociado Señor Marrero emitió la opinión del tribunal.

El fiscal del distrito de San Juan formuló ante la Corte Municipal de San Juan varias denuncias por el delito de libelo contra Prensa Insular de Puerto Rico, Inc. y contra Antonio Ayuso Valdivieso. Luego de celebrados los juicios de rigor ante dicha corte y *de novo* en el Tribunal de Distrito de San Juan, dos de esas denuncias se encuentran ahora ante nos. Ambos casos fueron sometidos por la misma prueba ante el tribunal a quo, sentenciándose en cada uno de ellos a Prensa Insular de Puerto Rico, Inc., a pagar una multa de $300 y a Antonio Ayuso Valdivieso una de $200, o en su defecto a sufrir un día de cárcel por cada dólar que éste dejare de satisfacer, no debiendo exceder la prisión subsidiaria de noventa días, más las costas. Las denuncias objeto de los recursos interpuestos por ambos acusados rezan en lo esencial así:

"Los referidos acusados, la Corporación Prensa Insular de Puerto Rico, Inc., que es una corporación organizada bajo las leyes de Puerto Rico . . . como propietaria y editora del periódico que diariamente se publica en la ciudad de San Juan, Puerto Rico, denominado 'El Imparcial', y Antonio Ayuso Valdivieso como director del referido periódico, ilegal, voluntaria y maliciosamente, y en San Juan, Puerto Rico, dentro del distrito judicial municipal del mismo nombre, permitieron publicar y en efecto publicaron e hicieron circular por la ciudad de San Juan y por toda la Isla de Puerto Rico en el mencionado periódico 'El Imparcial', allá para el día 31 de enero de 1947 en la edición del Año XIV, Tomo 25, Núm. 5654, un artículo bajo el epígrafe '¿Expropiación o Corrupción?—¡El Pueblo lo Dirá!', cuyo artículo que circuló lee como sigue:

(1) " 'En burla de la ley y con escarnio de la justicia, valiéndose del subterfugio, puesto en boga últimamente, de la expropiación forzosa, el Comisionado de Instrucción Pública, Mariano Villaronga, acaba de realizar una transacción comercial ilegal con la Caguas Development Company, de la cual es socio principalísimo el Comi-

sionado de lo Interior, Orlando R. Méndez, mediante la cual El Pueblo de Puerto Rico pagó, por dos parcelas cuya área es de cuerda y media, la cantidad de $32,020, para ser divididas en solares y utilizadas en la construcción de varios edificios escolares en el sitio conocido por 'El Verde', de Caguas. (2) No obstante consignarse en los artículos 202, 203 y 205 del Código Político de Puerto Rico la prohibición de que funcionarios públicos tengan interés alguno en los negocios que se llevan a cabo con el Gobierno, el Comisionado de Instrucción Pública, Mariano Villaronga, utilizando la propia oficina del Procurador General de Justicia, presentó el día 15 de los corrientes, una demanda de expropiación forzosa contra la Caguas Development Company, uno de cuyos socios es el actual Comisionado de lo Interior, Orlando R. Méndez, para expropiarla de dos parcelas de terreno ubicadas en Caguas, en los terrenos conocidos por 'El Verde', las cuales miden, la primera, una cuerda con 407 milésimas de otra, y 523 milésimas de cuerda la segunda, que hacen, en total, cuerda y media más o menos. (3) Estas parcelas aparecen delineadas en los planos levantados al efecto por el Departamento de lo Interior de Puerto Rico con fecha 24 de octubre de 1946 y 28 de diciembre de 1946. La demanda de expropiación que fué radicada en la Corte de Distrito de Caguas, y a que se refiere esta información, aparece firmada por Luis Negrón Fernández, quien está actuando como Procurador General Interino y por F. J. Pérez Almiroty y F. Navarro Mendía oficiales de la Procuraduría General de Justicia. (sic) (4) Siguiendo el procedimiento de expropiación que hoy se estila, Mariano Villaronga, actuando a nombre y en representación de El Pueblo de Puerto Rico, y en su carácter de Comisionado de Instrucción Pública, fijó el precio de $32,020 como la cantidad justa y razonable que debía pagar el Gobierno de Puerto Rico por la expropiación de ambas parcelas. (5) Ni Cortos ni Perezosos. No obstante haber alegado el Comisionado Villaronga en la demanda que cuantas gestiones amistosas se habían hecho para adquirir por compra las mencionadas parcelas por el precio indicado de $32,020 habían fracasado por negativa de la Caguas Development Company a venderlas por dicho precio, es lo cierto que los socios de dicha empresa, no bien notificada ésta de la demanda presentada en su contra para expropiarla de las dos parcelas susodichas, ni cortos ni perezosos se allanaron al día siguiente de la notificación, aviniéndose a aceptar la generosa oferta del Comisionado Villaronga. (6) Al Que Dios Se lo Da . . . Sí rápidamente transcurrió el tiempo entre la presentación de la demanda por el Procurador y el allanamiento a la misma de los socios de la Caguas Development Company,

con no menor presteza actuó la justicia, pues con fecha 17 de enero, o sea ál día siguiente de incoada la demanda, la Corte de Distrito de Caguas, por voz de su Juez, licenciado José Villares Rodríguez, dictó la siguiente sentencia: (7) "SENTENCIA. El Pueblo de Puerto Rico, representado por el Comisionado de Instrucción, Mariano Villaronga, ha radicado una demanda de expropiación forzosa contra la Caguas Development Company, una sociedad constituída de acuerdo con las leyes de Puerto Rico, mediante escritura número 128, otorgada ante el Notario don Luis Morales Contreras, en Caguas, P. R., el día 7 de julio de 1945, y con oficinas principales en la ciudad de Caguas. Las propiedades objeto de esta acción son dos parcelas de terreno de carácter rural radicadas en el barrio Turabo de Caguas, en la Urbanización 'El Verde' con un área de una cuerda 407 milésimas de otra la primera, y 523 milésimas de cuerda la segunda, las cuales se describen así: 'A' y 'B' (tal como están en la demanda). —Estas parcelas de terreno son segregación de finca de mayor cabida descritas así:—'Rústica: Predio de terreno, etc., etc., (demanda).'— El interés que el Pueblo de Puerto Rico se propone adquirir en el referido inmueble es el de un título de dominio absoluto para llevar a cabo la ampliación de la Escuela Superior y de la Escuela Intermedia de Caguas, P. R., así como construir un nuevo edificio escolar, todo lo cual constituye una necesidad pública a tenor de lo dispuesto en la sección 2 de la Ley número 256 del 3 de abril de 1946. El Pueblo de Puerto Rico depositó en la Secretaría de esta Corte, la cantidad de $32,020; o sea $23,800 por la parcela 'A' y $8,200 por la parcela 'B'.— La demandada Caguas Development Co. compareció en autos y se allanó a la demanda a través de su socio administrador Luis Sugrañes Izquierdo.— Por tanto, se dicta sentencia declarando que El Pueblo de Puerto Rico ha sido investido con el título de pleno dominio sobre las parcelas arriba descritas, con todas sus edificaciones, mejoras, usos, servidumbres y pertenencias, incluyendo todo derecho, título o interés que pueda tener la demandada en las mismas, para ser destinadas al uso público indicado. Se dispone además, que la demandada o sus representantes, agentes o empleados que tengan la posesión de dichas propiedades, transfieran y entreguen las mismas al Comisionado de Instrucción; se tiene como justa y razonable la cantidad depositada en corte como compensación por la adquisición de las parcelas y se ordena al Registrador de la Propiedad de Caguas, P. R., que inscriba el título de pleno dominio sobre dichas propiedades a favor de El Pueblo de Puerto Rico, libre de toda clase de cargas, gravámenes, menciones, reservas o defectos de cualquier naturaleza.— Caguas, P. R., a 17 de enero

de 1947. (Fdo.) J. Villares Rodríguez, Juez.'' (8) La Junta de Planificación, que preside Rafael Picó y que está instalada en las inmediaciones del Departamento de lo Interior, el cual tenía conocimiento desde hacía mucho tiempo de que esta operación ilegal se estaba efectuando, también se prestó a que se llevara a cabo este negocio, pues esta Junta, con premura inusitada y celeridad que desconcierta a los que conocen su engorroso expedienteo, aprobó con fecha del 4 de diciembre, una resolución aprobatoria de esa negociación; es decir, se anticipó a la negociación misma dándole de antemano su aprobación. (9) Costo Original.—Según aparece en el Registro de la Propiedad, la finca principal de la cual se segregaron las dos parcelas adquiridas por El Pueblo la formaba una finca de 94 cuerdas que Luis Sugrañes Izquierdo, casado con Joaquina Costa Coll; Orlando R. Méndez, casado con Delsie Mayoral Acosta; y María Mercedes Costa Coll, compraron por escritura pública, el 7 de julio de 1945, por el precio de $102,000, o sea, a razón de $1,085 la cuerda, la cual finca fué aportada a la Caguas Development Company por los citados compradores. Ahora resulta que dos parcelas de la misma finca, que suman cuerda y media aproximadamente, han sido expropiadas por el llamado ''gobierno de pobres para pobres'' al Comisionado del Interior, Orlando Méndez, y a sus socios de la Caguas Development Company, por la suma, comparativamente astronómica, de $32,020, ¡casi treinta veces más que su valor en el 7 de julio de 1945!—La Caguas Development Company es una sociedad civil que fué constituída por escritura pública otorgada en Caguas el 7 de julio de 1945 ante el notario Luis Morales Contreras, siendo sus socios Luis Sugrañes Izquierdo, Joaquina Costa Coll, Orlando R. Méndez (actual Comisionado de lo Interior), y María Mercedes Costa Coll y José Pomar Valls. (10) Conformidad inexplicable.—Las personas enteradas de los pormenores de esta transacción no pueden concebir cómo pudo Villaronga alegar en la demanda que las gestiones amistosas para adquirir las parcelas expropiadas habían fracasado por la negativa de la Caguas Development Company a vender por la cantidad de $32,020 cuando, al siguiente día de haber sido notificada la demandada, hubo el allanamiento y conformidad de parte de los susodichos socios en la venta por el indicado precio. (11) Tampoco se ha podido nadie explicar cómo pudo el Procurador General intervenir en este asunto sin averiguar que el Comisionado de lo Interior, Orlando R. Méndez, era condueño de ''El Verde'', cuando en la faz de la propia demanda de expropiación aparece la constitución de la sociedad Caguas Development Company, de la cual es socio el Comisionado de lo Interior. ¡Cosa rara! (12) Y si de

extrañar es la conducta del Procurador mucho más extraña es todavía la conducta y actitud del Auditor de Puerto Rico, Rafael de J. Cordero, que, sin poner reparo alguno, ordenó el pago de tan crecida suma de dinero sin antes escudriñar una transacción de la naturaleza de la que ahora ha quedado al descubierto. (13) Dice la Ley.—Artículo 202 del Código Político: "Ningún miembro de la Asamblea Legislativa, ni funcionario de la Isla, ciudad o pueblo, podrá tener interés en ningún contrato celebrado por él en su carácter oficial, o por cualquier cuerpo o junta de que fuere miembro, y en todos dichos contratos habrá la condición expresa de que ningún miembro de la Asamblea Legislativa ni funcionario de la Isla, ciudad o pueblo, podrá ser admitido a una parte o porción de tal contrato."—Artículo 203 del Código Político: "A todo funcionario público de la Isla, ciudad o pueblo le está prohibido ser comprador o vendedor en operaciones de compra y venta que dispusiere o hiciere en su carácter oficial."—Artículo 204 del Código Político: "Todo contrato celebrado en contravención de cualquiera de las disposiciones de los dos artículos anteriores podrá anularse a instancias de cualquiera persona, excepto el funcionario interesado en dicho contrato." Artículo 205 del Código Político: "A los funcionarios del Gobierno Insular, así como a los de las diversas ciudades y pueblos y a sus respectivos delegados y subalternos, les está prohibido comprar y vender, o de modo alguno directa o indirectamente, recibir para su propia utilidad, o la de cualquier otra persona o personas, ningún libramiento, cédula, orden, acción, reclamación, u otro documento o testimonio de crédito contra Puerto Rico o cualquier ciudad o pueblo del mismo, excepto los documentos de crédito que tuvieren en su poder expedidos a su favor por servicios prestados en su carácter oficial, o valores contra la deuda consolidada de Puerto Rico o cualquiera ciudad o pueblo del mismo."—Artículo 86 del Código Penal de Puerto Rico: "Todo funcionario que en contravención de las leyes se interesare en contratos o efectuare compras o ventas en pública subasta; o adquiriere certificados de acciones u otros valores fiduciarios, incurrirá en una multa máxima de mil dólares, o en pena de presidio por un término máximo de cinco años, quedando por siempre inhabilitado para ejercer cargo público." '

"Siendo los conceptos consignados en el transcrito artículo publicados con el propósito deliberado de difamar al Comisionado de Instrucción, Sr. Mariano Villaronga, en su expresado carácter de Comisionado de Instrucción Pública de Puerto Rico, quien como tal tiene establecida su oficina en esta ciudad de San Juan, Puerto Rico, dentro de la cual se hizo publicar y se hizo circular por los refe-

ridos acusados el mencionado periódico conteniendo el artículo. de referencia, y para impugnar su honradez e integridad, exponiéndolo al odio, desprecio y ridículo públicos y de desacreditarlo, menospreciarlo y deshonrarlo en su buena reputación y fama, imputándole entre otros actos, actuaciones ilegales y contrarias a la moral pública y en perjuicio de los intereses de El Pueblo de Puerto Rico, como lo demuestran los siguientes párrafos del mencionado artículo.''

Aquí se repiten los párrafos que, para conveniencia nuestra, hemos marcado más arriba con los números 1, 2, 6, 7, 8, 9, 10 y 12 (en parte), y terminando la primera denuncia así:

''Los transcritos párrafos fueron publicados con el deliberado propósito y con el fin calculado de hacer aparecer ante la opinión pública de Puerto Rico al Comisionado de Instrucción Pública, Sr. Mariano Villaronga, de haber participado conjuntamente con los señores Orlando R. Méndez, Comisionado del Interior de Puerto Rico, Rafael de J. Cordero, Auditor de Puerto Rico, Rafael Picó, Presidente de la Junta de Planificación, Urbanización y Zonificación de Puerto Rico, Luis Negrón Fernández, Procurador General Interino de Puerto Rico, y José Villares Rodríguez, Juez de la Corte de Distrito del Distrito Judicial de Caguas, Puerto Rico, todos y cada uno de ellos en sus respectivos caracteres oficiales como tales funcionarios, puestos de acuerdo, en una conspiración en relación con una transacción para la adquisición por El Pueblo de Puerto Rico de dos parcelas de terreno radicadas dentro del término municipal de Caguas, Puerto Rico, y entonces de la propiedad de la Caguas Development Company, por un precio en tremendo exceso del valor real de dichos terrenos, en contravención de las leyes de Puerto Rico y para defraudar a El Pueblo de Puerto Rico en una considerable suma de dinero.—

''Se acompaña marcándose 'Exhibit 1', edición del periódico 'El Imparcial' del día 31 de enero de 1947, Año XIV, Tomo 25, Número 5654, conteniendo el artículo '¿Expropiación o Corrupción? ¡El Pueblo lo Dirá!'; se acompaña marcándose 'Exhibit 2', edición del periódico 'El Imparcial' del día 3 de febrero de 1947, Año XIV, Tomo 25, Número 5657, donde aparece un artículo titulado:— 'A un Calificativo, un Reto', y en la portada, en letras rojas, la frase: 'Si no es Verdad, ¿Por qué, por qué no nos Denuncian?'.—Lo que denuncio como un hecho contrario a la ley, la paz y la dignidad de El Pueblo de Puerto Rico.''

La segunda denuncia contiene un párrafo introductorio similar al de la que hemos copiado más arriba y alega que ''los referidos acusados. . .permitieron publicar y en efecto publicaron e hicieron circular por la ciudad de San Juan y por toda la Isla de Puerto Rico en el mencionado periódico 'El Imparcial', allá para el día 1ro. de febrero de 1947 en la edición del Año XIV, Tomo 25, Núm. 5655, un artículo bajo el epígrafe 'Notas Editoriales—Expropiación entre Compadres', cuyo artículo que circuló lee como sigue:

'' 'Estamos en vísperas de una nueva sesión legislativa. O mucho nos equivocamos, o en esa próxima sesión se aprobará una ley para impedir que cualquier artículo del Código Político de Puerto Rico —y por extensión cualquier artículo de cualquiera ley—pueda ser interpretado por cualquier juez en tal forma que pueda hacer daño a los intereses particulares de cualquier funcionario público que esté bien acomodado dentro de la actual situación de Gobierno. (1) ¿Que por qué adelantamos esta posibilidad? Por la sencilla razón de que el Código Político de Puerto Rico, en sus artículos 202, 203, 204 y 205, prohibe expresamente a todo funcionario público ser partícipe en contrato alguno de compraventa en su carácter oficial y además por la otra razón—¡ya no tan sencilla!—de que ahora mismo varios funcionarios que ocupan puestos llaves en el Gobierno Insular, acaban de aparecer puestos de acuerdo en la concertación y cierre de una operación, espeluznantemente contraria a los intereses públicos que es a la vez groseramente contraria a las referidas disposiciones expresas del Código Político. (2) Y no se alegue que, al adelantar esta posibilidad de la sesión legislativa que se avecina, estamos dando rienda suelta a la fantasía. Para los dirigentes del actual gobierno de Puerto Rico, no hay nada fantástico en su pedregoso camino de atropellos y vejámenes al pueblo. Y si esos hombres han aprobado leyes para prohibir huelgas contra el Gobierno, y para prohibir pleitos contra el Gobierno, ¿qué de particular tendría, para su enturbiada conciencia de funcionarios públicos, que decidiesen aprobar una ley para prohibir también interpretaciones judiciales que pudiesen perjudicarles, aun cuando esas interpretaciones fuesen de estatutos fundamentales para la moral pública? (3) Hemos calificado de espeluznante la operación mercantil que estamos comentando. La mera lectura de los datos oficiales y constatados que publicamos en nuestra edición de ayer, es más que suficiente para justificar ese calificativo. Diga el lector si no es espeluznante que por cuerda y

media de una finca por la cual su comprador pagó hace poco más de dos años a razón de mil y pico de dólares la cuerda, el gobierno de Puerto Rico pague más de treinta y dos mil dólares, o sea, a razón de más de veintiún mil dólares la cuerda . . . Diga el lector si no es espeluznante que los dineros públicos así pagados vayan a parar a una sociedad de la que forma parte un miembro del Gabinete . . . Diga el lector si no es espeluznante que sea otro miembro del Gabinete quien, por sí y ante sí, fije para esa compra el monstruosamente exagerado precio . . . ¡Diga el lector si no son espeluznantes todos los demás detalles de una transacción que tiene todas las características de una confabulación para defraudar los intereses del pueblo! —El aserto tiene fácil comprobación. El Comisionado de Instrucción sin confirmar, Mariano Villaronga, fija el monstruoso precio de compra para cuerda y media de la finca "El Verde", de Caguas. El Comisionado de lo Interior, Orlando Méndez, es el consocio de la firma comercial que recibe el dinero. El Juez de la Corte de Distrito de Caguas, José Villares, aprueba la transacción en una demanda ridículamente llamada "de expropiación forzosa". El Procurador General Interino, Luis Negrón, firma la demanda. El Auditor de Puerto Rico, Rafael Cordero, corre a ordenar el pago. Y el Presidente de la Junta de Planificación, Rafael Picó, se apresura a ofrecer sus "buenos servicios" para que la transacción se consume lo antes posible . . . —Lo más trágicamente gracioso de todo esto es la declaración del Comisionado Villaronga, al efecto de que en sus "esfuerzos"(?) por realizar la compra de marras habían fracasado "todas las gestiones amistosas" . . . Entonces, ¿cómo explica el Comisionado que la firma demandada se apresurase a ceder, sin ir a los tribunales a sostener sus supuestos derechos y a demostrar por qué las gestiones "amistosas" habían fracasado? ¡Qué amigos tienes, Benito!, podrá decirse el pueblo, al enterarse de que, para fijar el monstruoso precio de compra, al Comisionado Villaronga no se le ocurrió, en el gobierno de los peritos, aconsejarse con una autoridad en esta materia. (4) Otro detalle extraordinario es el de la precipitación de la Junta de Planes en este *affaire*. Todos sabemos la pasmosa lentitud de ese organismo en sus expedienteos. Sin embargo, una transacción que se tramita el 17 de enero de 1947, es "aprobada" por la Junta el día 4 de diciembre anterior. . . . —¿Y qué nos dicen ustedes del auditor Cordero, ordenando el pago de prisa y corriendo? El funcionario que ha querido demostrar su empeño en escudriñar el curso de los dineros del pueblo, ese día se levantó con un humor tan bueno, ¡tan bueno!, que decidió que una transacción en la que estaban envueltos los

intereses de su colega de lo Interior, no había necesidad de escudriñarla. . . (5) Ésta es la historia de la cuerda y media de "El Verde". Ojalá que el lector, por una asociación de ideas, no la ponga a bailar en su mente con aquella otra triste historia del hombre del chaquetón verde. . . . . '

"Siendo los conceptos consignados en el transcrito artículo publicados con el propósito deliberado de difamar al Comisionado de Instrucción, Sr. Mariano Villaronga, en su expresado carácter de Comisionado de Instrucción Pública de Puerto Rico, quien como tal tiene establecida su oficina en esta ciudad de San Juan, Puerto Rico, dentro de la cual se hizo publicar y se hizo circular por los referidos acusados en el mencionado periódico 'El Imparcial' conteniendo el artículo de referencia, conceptos para impugnar su honradez e integridad, virtud y buena fama, exponiéndolo al odio, desprecio y ridículo públicos y de desacreditarlo, menospreciarlo y deshonrarlo en su buena reputación y fama, imputándole además, entre otros actos, actuaciones ilegales, conjuntamente con el Auditor de Puerto Rico, Sr. Rafael de J. Cordero, el Comisionado de lo Interior, Sr. Orlando R. Méndez, el Presidente de la Junta de Planificación, Urbanización y Zonificación, Sr. Rafael Picó, el Hon. Luis Negrón Fernández, Procurador General Interino y el Hon. José Villares Rodríguez, Juez de Distrito de Caguas, la comisión de infracción al artículo 62 del Código Penal de Puerto Rico, sobre conspiración, como lo demuestran los siguientes párrafos del mencionado artículo."

Aquí se copian los párrafos que, para conveniencia nuestra, hemos marcado con los números 1, 3 y 5, y termina la denuncia así:

"Los transcritos párrafos fueron publicados con el deliberado propósito y con el fin calculado de hacer aparecer ante la opinión pública de Puerto Rico al Comisionado de Instrucción Pública, Sr. Mariano Villaronga, de haber participado conjuntamente con los señores Orlando R. Méndez, Comisionado del Interior de Puerto Rico, Rafael de J. Cordero, Auditor de Puerto Rico, Rafael Picó, Presidente de la Junta de Planificación, Urbanización y Zonificación de Puerto Rico, Luis Negrón Fernández, Procurador General Interino de Puerto Rico, y José Villares Rodríguez, Juez de la Corte de Distrito del Distrito Judicial de Caguas, Puerto Rico, todos y cada uno de ellos en sus respectivos caracteres oficiales como tales funcionarios, puestos de acuerdo, en una conspiración en relación con una transacción para la adquisición por El Pueblo de Puerto Rico de

694

dos parcelas de terreno radicadas dentro del término municipal de Caguas, Puerto Rico, y entonces de la propiedad de la Caguas Development Co., por un precio en tremendo exceso del valor real de dichos terrenos, en contravención de las leyes de Puerto Rico y para defraudar a El Pueblo de Puerto Rico en una considerable suma de dinero.—Se acompaña marcándose Exhibit 1, edición del periódico 'El Imparcial' del día 1ro. de febrero de 1947, Año XIV, Tomo 25, Núm. 5655, conteniendo el artículo 'Notas Editoriales—Expropiación entre Compadres' y la caricatura que aparece en la página 19 del mismo periódico y la misma fecha, titulada 'El *Team* de El Verde'; se acompaña marcándose Exhibit 2, edición del periódico 'El Imparcial' del día 3 de febrero de 1947, Año XIV, Tomo 25, Núm. 5657, donde aparece un artículo titulado 'A un Calificativo, Un Reto', y en la portada en letras rojas, la frase 'Si no es Verdad, ¿Por qué, por qué no nos Denuncian?'—Lo que denuncio como un hecho contrario a la ley, a la paz y a la dignidad de El Pueblo de Puerto Rico.''

 Insisten en primer lugar los acusados en que el tribunal de distrito cometió error manifiesto al no resolver que los actos imputádosles no constituyen delito público. Dispone el artículo 243 del Código Penal que ''Constituye libelo cualquiera maliciosa difamación expresada por medio de escritos, impresos, signos, láminas, dibujos, u otra forma análoga, tendentes a denigrar la memoria de un difunto, o impugnar la honradez, integridad, virtud o buena fama de un vivo, o publicar sus defectos naturales o supuestos, exponiéndole así al odio, desprecio o ridículo público.'' Provee, asimismo, el artículo 248 del Código Penal que ''A todo autor, editor o propietario de algún libro, periódico o publicación por entregas, podrá exigírsele responsabilidad por la publicación de palabras contenidas en cualquiera parte de dicho libro o número de dicho periódico o publicación por entregas.'' En las denuncias figuran textualmente dos artículos que aparecieron en el periódico ''El Imparcial'', del cual Prensa Insular de Puerto Rico, Inc., es dueña y Antonio Ayuso Valdivieso director. En esos artículos se imputa a Mariano Villaronga, en su carácter de Comisionado de Ins-

trucción de Puerto Rico, el haberse confabulado con otros funcionarios del Gobierno con el propósito de defraudar al Pueblo de Puerto Rico. Una confabulación de esta naturaleza constituye el delito de conspiración a tenor de lo provisto por el artículo 62 del Código Penal.([1]) *Cf. Mulero v. Martínez,* 58 D.P.R. 321, 326. Cuando se imputa la comisión de hechos constitutivos de delito, el libelo es procesable *per se.*([2]) Las denuncias imputan, además, a Villaronga el haber contribuído a sabiendas a que se violen los preceptos de los artículos 202 y 203 del Código Político,([3]) así como las disposiciones del artículo 86 del Código Penal.([4]) En este último caso él sería también culpable de ese delito como coautor del mismo. Los artículos publicados, están asimismo concebidos en términos tales que tienden a impugnar la honradez, integridad, virtud y buena fama de Villaronga y le exponen al odio, desprecio y ridículo públicos. Publicaciones concebidas en tales términos constituyen el delito de libelo. *Pueblo v. Sierra (a) Luis Dalta,* 48 D.P.R. 261. Por otra parte, la caricatura mencionada en la segunda denuncia y que lleva el título "El *team* de 'El Verde' ", representa a ocho jugadores de futbol juntos, colocados en tal posición que aparentemente se ponen de acuerdo para realizar una jugada, dándoles todos la espalda a un balón en que aparecen las

([1])El artículo 62 del Código Penal reza en lo pertinente como sigue: "Si dos o más personas conspiraren . . . (4) para estafar y defraudar a alguna persona en sus bienes por medios en sí criminales, u obtener dinero o bienes valiéndose del engaño . . . tales personas serán penadas con cárcel por un término máximo de un año o multa máxima de mil dollars o ambas penas."

([2])Para un estudio de qué se entiende por libelo *per se* en California y en otros estados, véase 17 Southern California Law Review, pág. 347.

([3])Los artículos del Código Político arriba mencionados aparecen en la primera denuncia con el contexto que tenían antes de ser enmendados por la Ley núm. 124 de 8 de agosto de 1913, pág. 41.

([4])El artículo 86 del Código Penal dice así: "Todo funcionario que en contravención a las leyes se interesare en contratas o efectuare compras o ventas en públicas subastas, o adquiriere certificado de acciones u otros valores fiduciarios, incurrirá en una multa máxima de mil dólares, o en pena de presidio por un término máximo de cinco años, quedando por siempre inhabilitado para ejercer cargo público."

palabras "intereses públicos". Una caricatura como ésa, considerada conjuntamente con los dos artículos publicados, resulta igualmente libelosa. Véanse el artículo 253 del Código Penal y *Pueblo* v. *Pacheco Padró*, 58 D.P.R. 737. Admitiendo la veracidad de lo alegado en las denuncias, como es imperativo hacerlo cuando se señala un error de esta naturaleza, llegamos a la conclusión de que las denuncias imputan el delito de libelo y de que el primer error no ha sido cometido.

Sostienen además los acusados que la corte a quo erró al no tener por comunicación privilegiada los artículos "¿Expropiación o Corrupción? ¡El Pueblo lo dirá!" y "Expropiación Entre Compadres", y la caricatura "El *team* de 'El Verde' " por referirse tales publicaciones a un asunto de interés público; al no resolver que de acuerdo con la prueba los mencionados artículos constituyen una publicación imparcial y exacta de actos de carácter oficial realizados por funcionarios públicos; al no resolver que la publicación de los referidos artículos no se presume maliciosa; al no resolver que por referirse a actos realizados por funcionarios públicos en el desempeño de sus funciones, ningún comentario en relación con los hechos narrados, que exprese la opinión personal de los acusados, lleva consigo responsabilidad criminal, no importa cuán severos y cuán duros sean los términos en que tal comentario se haga; y al resolver que el fiscal lo único que tiene que probar es que se publicaron los artículos.

Provee el artículo 251 de nuestro Código Penal que "Una comunicación dirigida a persona interesada en tal comunicación, por otra persona que también lo estuviere, o cuyas relaciones con aquélla justificare la suposición de haber obrado sin malicia, no deberá presumirse maliciosa, sino que se tendrá por comunicación privilegiada." Este artículo, sin embargo, no es aplicable a la situación que está ante nos, pues como dijimos en el caso de *Pueblo* v. *Gotay*, 43 D.P.R. 461,

463, "la comunicación en este caso fué hecha para todo el público en general." Ya hemos dicho que los artículos publicados en los números del periódico "El Imparcial" a que se hace referencia en las denuncias imputan la comisión del delito de conspiración a Villaronga y que además contienen frases injuriosas contra éste. Una comunicación difamatoria, por la que se imputa a otro un delito, no es privilegiada. La ley presume la malicia en comunicaciones de tal índole. Las publicaciones a que hacen referencia las denuncias eran difamatorias *per se*. *Pueblo* v. *Gotay,* supra, y *Pueblo* v. *Pacheco Padró,* supra. Cuando de imputaciones libelosas *per se* se trata, el ministerio público no viene obligado a probar la malicia, pues ésta se presume del mero hecho de la publicación, probada la cual puede el acusado controvertir la presunción de malicia ofreciendo evidencia tendiente a establecer la verdad de los hechos imputádosle y el motivo justificable para la publicación. *Pueblo* v. *Girona,* 59 D.P.R. 296. Como fácilmente podrá verse por el artículo 246 del Código Penal(⁵), la única defensa de los acusados en estos casos es que la materia supuestamente libelosa se ajuste a la verdad y se hubiere hecho con sana intención y para fines justificables o que de acuerdo con el artículo 251 del mismo cuerpo legal pudiera considerarse como una comunicación privilegiada. La referencia que se hace en el artículo 246 al efecto de que la comunicación debe haberse publicado con sana intención y para fines justificables está supeditada a que dicha comunicación sea cierta. Quedan así resueltos los errores señalados bajo los números II, III, V y VIII.

■ En el séptimo error alegan los acusados que el tribunal sentenciador erró al admitir en evidencia, contra la oposición de ellos, los artículos que aparecen en los números

---

(⁵)Artículo 246 del Código Penal.—''En todos los procesos promovidos. por libelo, se podrá testificar la verdad ante el tribunal o jurado, y si éste estimare ser cierto lo denunciado como infamatorio, y haberse publicado con sana intención y para fines justificables, deberá absolverse libremente al acusado; incumbiendo al jurado determinar las cuestiones de hecho y de derecho.''

mencionados del periódico "El Imparcial", al igual que la caricatura intitulada "El *team* de 'El Verde' ". No existe tal error. Ayuso Valdivieso, como acusado y en su carácter de director de la coacusada Prensa Insular de Puerto Rico, Inc., admitió francamente, mientras declaraba como testigo, haber redactado el primero de dichos artículos y haber ordenado la preparación del otro. Por ese solo motivo los artículos publicados eran admisibles en evidencia. Dichos artículos constituían, además, la médula de las denuncias formuladas y eran la mejor prueba de su contenido, siendo en su consecuencia, admisibles también plor este motivo.

En los errores marcados IV, IX y X alegan los acusados que el tribunal sentenciador cometió error manifiesto al no resolver que de acuerdo con la prueba los hechos denunciados como infamatorios son ciertos y se publicaron con sana intención y para fines justificables; al apreciar la prueba del fiscal y de la defensa; al declarar culpables a los acusados y al dictar sentencia en su contra. Estos errores se dirigen a la apreciación de la prueba hecha por el tribunal a quo. Si bien es cierto que la prueba demostró que los artículos publicados se ajustaban en parte a la verdad, no es menos cierto que dichos artículos contenían párrafos, o por lo menos oraciones completas, que eran enteramente inciertos sobre cuestiones que resultaban ser libelosas. La prueba fué verdaderamente voluminosa y no intentaremos siquiera hacer una reseña de ella en su totalidad. La haremos tan sólo a grandes rasgos. Ella demostró que en 8 de junio de 1945 Luisa Esteves Solá concedió a Luis Sugrañes plor escritura pública una promesa de venta por 120 días sobre una finca de 108.99 cuerdas a base de un precio de $100.000; que 13 días más tarde la Sra. Esteves Solá vendió la totalidad de la referida finca a Luis Sugrañes, Orlando R. Méndez y María Mercedes Costa Coll de Pomar, quienes constituyeron poco después una sociedad bajo la razón social de Caguas

Development Co.; que en 13 de septiembre de 1945 la Caguas Development Co. segregó 25 cuerdas de esa finca para dedicarlas a la urbanización "El Verde"; que antes de constituirse por escritura pública la ameritada sociedad, ésta radicó ante la Junta de Planificación una Declaración de Intención de Lotificar las aludidas 25 cuerdas y hacía constar en su Declaración que ella era la propietaria del referido predio; que de la indicada sociedad era miembro Orlando R. Méndez, Comisionado del Interior de Puerto Rico; que el plano que se acompañó a dicha declaración había sido trazado por el propio Orlando R. Méndez; que el Tesorero de Puerto Rico, por mediación del tasador Francisco Medina Mora, y a los fines de la imposición de contribuciones sobre la propiedad, tasó en 28 de enero de 1946 las 25 cuerdas que constituían la finca "El Verde" a 25 centavos el metro y seis días más tarde el mismo tasador valoró dichos terrenos a los fines de su expropiación por el Pueblo de Puerto Rico a razón de $4.50 el metro cuadrado para la parcela "A" y de $4.25 el metro cuadrado para la parcela "B"; que dicho tasador tasó primeramente los terrenos como finca rústica a razón de $1,000 por cuerda, siendo ésa una de las normas internas del Negociado de la Tasación de la Propiedad del Departamento de Hacienda en casos de urbanizaciones; que la práctica en dicho Departamento es tasar toda urbanización como finca rústica hasta tanto se hacen las ventas de los primeros solares y al traspasarse éstos se tasan por metro cuadrado y de ahí que el indicado tasador siguiera tal práctica en este caso al tasar las parcelas a ser adquiridas mediante expropiación por el Departamento de Instrucción; que el Procurador General Enrique Campos del Toro le devolvió al Comisionado de Instrucción interino en junio 10 de 1946 el proyecto de escritura de compra a ser otorgada por la Caguas Development Co., en lo concerniente a la parcela "B", y se negó a aprobar el expresado proyecto de escritura por ser el Comisionado Méndez miembro de la vendedora Caguas Develop-

ment Co. y violarse así los preceptos del artículo 203 del Código Político; que de este hecho tuvo más tarde conocimiento Villaronga; que luego se enviaron por H. A. Martin, Comisionado de Instrucción interino, a la Caguas Development Co., dos "Notificaciones sobre Oferta del precio de Compra", insistiendo en que ésta le vendiera al Pueblo de Puerto Rico las parcelas "A" y "B" de la urbanización "El Verde" por $23,800 y $8,220 respectivamente; que en la demanda de expropiación se alegó que la Caguas Development Co. se había negado a aceptar las ofertas héchasle, no siendo tal cosa cierta; que esa alegación se hizo constar en la demanda porque en opinión del Departamento de Justicia o, por lo menos, en opinión del Lic. Federico J. Pérez Almiroty, jefe para aquel entonces de la División de Tierras de dicho Departamento y uno de los abogados que suscribió la demanda, la misma era necesaria por ser "la única forma en que se podía adquirir por la corte la necesaria jurisdicción para poder adquirir, mediante expropiación forzosa, esas tierras, para cumplir ese fin público que estaba envuelto en el caso, . . . "; que se radicó la demanda de expropiación ante la Corte de Distrito de Caguas acompañada de una declaración de adquisición y entrega material de la propiedad, suscrita por Mariano Villaronga, acompañada de un cheque por la suma de $32,020; que las dos parcelas objeto de la demanda son contiguas a los terrenos ocupados por la Escuela Superior de Caguas y se utilizarían en ampliar el núcleo escolar de dicha ciudad; que un día después la corte dictó sentencia invistiendo al Pueblo con el título de las dos parcelas descritas y que al día siguiente de dictada la sentencia, la Caguas Development Co. se allanó a lo solicitado en la demanda y pidió que se le entregara el cheque depositado en la secretaría.

La prueba demostró igualmente que los terrenos adquiridos originalmente por las tres personas que constituyeron la Caguas Development Co., eran terrenos rústicos y que los

adquiridos mediante el procedimiento de expropiación eran terrenos ya urbanizados. También demostró la prueba a qué se debió la diferencia tan marcada en las dos tasaciones, así como que solares contiguos a los terrenos que fueron objeto de la expropiación se habían vendido, poco antes de haber tenido ésta lugar, a personas particulares a $5.00, $4.75 y $4.50 el metro cuadrado.

La prueba no demostró que se acudiera al procedimiento de expropiación como un subterfugio;([6]) que la transacción fuera ilegal; que el área de las dos parcelas fuera cuerda y media (demostrándose, por el contrario, que tal área era casi de dos cuerdas, o sea 1.930 cuerdas) ; que el precio pagado,· según la tasación oficial hecha por el Tesorero por mediación de uno de sus tasadores, fuera casi treinta veces mayor que su valor en 7 de julio de 1945; que el procedimiento de expropiación fuera contrario a la ley por el mero hecho de que uno de los socios de la entidad a quien las fincas a ser expropiadas pertenecían era Comisionado del Interior de Puerto Rico; que fuera contraria a derecho la actuación del Auditor de Puerto Rico al ordenar prontamente el pago de la suma de $32,020 requerida para acompañarla con la demanda de expropiación; o que hubiera habido corrupción, confabulación o conspiración entre Mariano Villaronga y. los demás funcionarios del Gobierno que se mencionan en los artículos publicados al adquirir dichas dos parcelas de terreno a los precios indicados mediante procedimiento de expropiación.

Así pues, hubo suficiente prueba en los autos para justificar las sentencias dictadas por el tribunal a quo y no se nos ha demostrado por otra parte que éste cometiera manifiesto error o actuara movido por pasión, prejuicio o parcialidad. Tampoco se cometió error, en su consecuencia, al resolver

---

([6])Por la Ley 115 de 8 de mayo de 1945 (pág. 379), según fué enmendada por la núm. 256 de 3 de abril de 1946 (pág. 527), el Comisionado de Instrucción está facultado para adquirir terrenos y solares para escuelas públicas urbanas y rurales, para facilidades bibliotecarias y para segundas unidades rurales, mediante compra o expropiación forzosa.

que los hechos denunciados como infamatorios no eran ciertos, ni al declarar a los acusados culpables del delito de libelo.

*No habiéndose cometido ninguno de los errores imputados al tribunal sentenciador, las sentencias apeladas deben ser confirmadas.*

El Juez Asociado Sr. Negrón Fernández no intervino.

## Opinión concurrente del Juez Asociado Sr. Snyder.

Los acusados publicaron una acusación al efecto de que ciertos funcionarios del gobierno, incluyendo al Comisionado de Instrucción, realizaron una conspiración criminal para obtener del gobierno y a favor de la Caguas Development Co. un precio excesivo por las tierras de ésta. Los acusados no pudieron probar que esta acusación era cierta. En su consecuencia, voto para que la sentencia sea confirmada.

Sin embargo, creo que debemos indicar en un caso de esta naturaleza que los acusados tenían derecho a publicar el hecho de que el procedimiento de expropiación incorrectamente alegó que se radicaba porque las partes no se habían podido poner de acuerdo en cuanto al precio, cuando la realidad era que se recurría a la expropiación porque el Código Político prohibía la venta voluntaria de los terrenos.

Además de esta declaración incierta del verdadero motivo de la expropiación, la querella, la moción de la Caguas Development Co. aceptando el depósito, el cual según la querella había sido rechazado anteriormente, y la sentencia por consentimiento, fueron radicadas casi simultáneamente. Si se le hubiera dicho al juez de distrito que estaba dictando una sentencia por consentimiento en un caso donde el Código Político prohibía la venta voluntaria, quizá se hubiera negado a firmarla y hubiera insistido en una vista pública en donde se presentara evidencia y se hubiera adjudicado el valor.

Estoy convencido de que estos hechos, que a primera vista parecen sospechosos, ocurrieron no debido a alguna conspiración criminal o corrupción, sino a la ineptitud de un subalterno del Procurador General que estaba tramitando el procedimiento de expropiación. No obstante, como estas circunstancias poco corrientes tuvieron lugar, no votaría para condenar a los acusados si éstos meramente las hubieran publicado y las hubieran comentado razonablemente. Al publicar algo más y al hacer una acusación de conspiración criminal, para la cual no hay base posible en el récord, los acusados infringieron nuestra ley de libelo criminal.